**MAX M., and his parents, Mr. & Mrs. M., Plaintiffs,**

v.

**The ILLINOIS STATE BOARD OF EDUCATION, et al., Defendants.**

**No. 82 C 6575.**

United States District Court, N.D. Illinois, E.D.

March 10, 1986.

Matthew D. Cohen, Skokie, Ill., for plaintiffs.

Bernetta Bush, Bd. of Educ., Legal Dept., Chicago, Ill., for defendant Illinois State Bd. of Educ.

John A. Relias, Sherelyn R. Kaufman, Veddar, Price, Kaufman & Kammholz, Chicago, Ill., for defendants Bd. of Educ. of New Trier Tp. High School Dist. 203, New Trier Tp. High School Dist. 203, Roderick N. Bickert, and James A. Wolter.

Ralph Miller, Brydges, Riseborough, Morris, Franke & Miller, Chicago, Ill., for defendants North Suburban Special Educ. Dist. and Stanley Bristol.

## ORDER

BUA, District Judge.

This order concerns plaintiffs' motion for reconsideration under Rule 60(b) of the Federal Rules of Civil Procedure and both parties' cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated herein, plaintiffs' motion for reconsideration is granted, plaintiffs' motion for summary judgment is granted in part and denied in part, and defendants' motion for summary judgment is granted in part and denied in part.

## I. BACKGROUND

The plaintiffs' initial complaint stated claims which, although based on various federal and state statutory and constitutional provisions, were primarily derived from the Education for All Handicapped Children Act (EAHCA).[1] 20 U.S.C. § 1401 *et seq.* (1976). The EAHCA is a federal funding statute under which participating states receive federal funds to assist in providing educational and other related ser-

---

1. Plaintiffs originally brought claims under the EAHCA, 20 U.S.C. § 1401 *et seq.;* § 504 of the Rehabilitation Act, 29 U.S.C. § 794; 42 U.S.C. § 1983; the due process and equal protection clauses of the fourteenth amendment; the Illinois School Code, Ill.Rev.Stat. ch. 122, ¶ 14–1.01 *et seq.;* and the Illinois Constitution, Art. I, § 2; Art. X, § 1.

vices to handicapped children. Any State educational agency receiving funds under the EAHCA must establish procedures whereby handicapped children and their parents may protect their rights to a "free and appropriate public education." 20 U.S.C. § 1415(a) (1976).

The plaintiffs are Max M., a handicapped child within the meaning of the EAHCA,[2] and his parents. The parties named as defendants are designated as the "State Defendants," the "Intermediate Defendants," and the "Local Defendants." The State Defendants include: (1) the Illinois State Board of Education (ISBE); (2) Donald Gill, the Illinois Superintendent of Education; and (3) Edward Copeland, the Chairperson of the Illinois State Board of Education. The Local Defendants are: (1) New Trier High School District # 203 (District # 203); (2) the New Trier District # 203 Board of Education; (3) Ronald Bickert, Superintendent of Schools in District # 203, and (4) James Walter, Director of Special Education for District # 203. The final group of defendants, the Intermediate Defendants, include: (1) the North Suburban Special Education District (NSSED); and (2) Stanley Bristol, Superintendent of the NSSED.

Max M. attended New Trier West, a public high school in Northfield, Illinois, from 1977 to 1981. Because of his disorganization, difficulty in writing, and anxiety, his academic performance was poor. In January of Max' freshman year, Max was referred to New Trier's Department of Special Education for evaluation. Max was examined by New Trier's consultant, Dr. Traisman, who later issued a written report recommending long term "intensive psychotherapy" for Max. Although the parents and Dr. Traisman believed that Max should be seen by a male therapist, no male therapists were provided by New Trier for Max during his freshman year.

New Trier recommended to Max' parents that he be placed in two special education classes for the remainder of his freshman year, but the Ms rejected this recommendation as too drastic. Instead, a compromise was reached allowing Max to spend one hour a day in a resource room where a student is allowed to work individually with a teacher in a particular subject. Shortly thereafter, New Trier again proposed that Max be enrolled in a special education math class, and this time the parents agreed. Max' first semester freshman grades in his major subjects were four Ds. After a special education component was implemented during Max' second semester, Max received three Cs and one D in his major subjects.

During the summer following his freshman year, Max attended summer school at New Trier. The Ms met with representatives of New Trier that summer to discuss Max, and the Ms formally requested that their son receive psychotherapy from Frank Brull, a New Trier social worker.[3] Also during that summer, Max saw a private psychotherapist, Dr. Burg, for four sessions.

New Trier developed an Individual Education Program (IEP) for Max to commence in September of his sophomore year. The IEP included one special education class, attendance in the resource room three days a week, and four standard courses in which Max was to be mainstreamed with the general student body. This IEP was shown to the Ms sometime in late November. Although the IEP did not so state, Max was also offered psychotherapy twice a week by New Trier social worker, Frank Brull. Max, however, failed to attend his therapy sessions with Mr. Brull on a regular basis. By the end of his sophomore year, Max' academic and social behavior had shown serious deterioration. Max received a D in the class he took during the summer between his freshman and sophomore year

---

**2.** The term "handicapped children" in the context of the EAHCA includes "seriously emotionally disturbed children ... or children with specific learning disabilities, who by reason thereof require special education and related services." 20 U.S.C. 1401(1) (1976).

**3.** Qualified social workers are among the personnel authorized to administer psychotherapy as a related service under the EAHCA. 34 C.F.R. § 300.13(b)(2) 1983.

and received three Cs and two Fs in his first semester sophomore year. During his second semester, Max received three Ds and one F.

On May 30, 1979, New Trier recommended that Max attend the Central Campus Learning Center (CCLC), New Trier's off-campus facility designed for emotionally disturbed or behavior disordered students. In the CCLC a core teacher is assigned to each student and acts as instructor in most if not all the classes in which the student is enrolled. Students at the CCLC have no unsupervised time. Between 1979 and 1981, the maximum number of students attending CCLC at any one time was forty, and the average class size was eight.

On July 6, 1979 Max began receiving psychotherapy from Dr. Robert Rosenfeld, a psychiatrist. Aside from providing psychotherapy for Max, the Ms relied on Dr. Rosenfeld for input for Max' junior year placement. In that regard Rosenfeld first met with New Trier personnel on August 6, 1979 to discuss the proposed CCLC placement for Max' junior year. Rosenfeld informed the Ms that the CCLC placement could not be made without their knowledge and permission. Although Rosenfeld and the Ms discussed the possibility of a residential placement for Max, they all agreed not to pursue this option.

New Trier called a second meeting on August 20, 1979 to discuss Max' junior year placement. In addition to Dr. Rosenfeld, Dr. Wolter, New Trier's Director of Special Education, as well as the Ms, were in attendance. At this meeting, the CCLC placement for Max' junior year was approved by the parties. Rosenfeld felt the CCLC placement was a reasonable next step in addressing some of the problems Max had experienced in the larger setting of New Trier West. The Ms were informed by Dr. Wolter that if the CCLC placement did not work out, a due process hearing could occur.

A specific Individualized Education Plan (IEP) was prepared for Max naming Judy Knox as Max' core instructor. Knox observed that when Max first arrived at the CCLC, he seemed afraid to socialize with the other students, but as the year progressed he became much more socially interactive with his fellow classmates. At the end of his first semester at CCLC, Max received one A, two Bs, and one C. At the end of his second semester, Max received three As and one B. Max' scholastic improvement was a result of certain modifications in the regular CCLC program which enabled Max to succeed academically despite his insistence on not performing written work. Max was held accountable for work that he did not perform. The Ms received several low scholarship notices during his junior year explaining that Max was not completing his assigned work. Max' classroom behavior also showed improvement by the end of his junior year.

Aside from the educational component of Max' IEP, Max received group therapy at CCLC. Although family therapy sessions were to be provided by New Trier for the Ms, time conflicts with scheduling eventually led to a mutual agreement to discontinue the sessions. During Max' junior year, Dr. Rosenfeld was also providing private psychotherapy for Max at the Ms' expense. From July of 1979 to January of 1980, Rosenfeld saw Max twice a week. Thereafter he saw Max once a week. This reduction in sessions per week was due to the Ms' financial constraints.

Rosenfeld discussed Max' senior year placement with the Ms and a decision was reached allowing Max to continue at CCLC. Max' senior year IEP was discussed with the Ms in a conference on October 20, 1980 with New Trier. Ms. Knox noticed that Max began to socialize and interact more successfully with his classmates during his senior year. However, Max began to experience problems academically. During his first semester senior year, Max received one C, two Ds, and two Fs. Second semester senior year, Max received two Cs and three Ds. Although Ms. Knox felt that Max met the minimal expectations that she had for him in every class, she agreed that Max had many of the same problems at the end of his senior year as at the beginning of his junior year. Max'

weakening academic performance was reflected to the Ms through a series of low scholarship notices. The notices universally cited Max' lack of preparation and failure to complete assigned work.

By the end of Max' senior year he had earned more than the required amount of credits to graduate and was ranked 455 out of 546 students in the senior class. On May 15, 1981, New Trier by letter informed the Ms that Max would probably successfully complete all requirements for graduation and that graduation constituted a change in special education status. On May 29, 1981, the Ms filed a request for a due process hearing. Because of financial considerations, the Ms decided to discontinue Max' psychotherapy from Dr. Rosenfeld on June 16, 1981 and concentrate their resources on the due process hearing. The Ms expended a total of $8,855 for Max' private psychiatric care while he attended New Trier and CCLC.

Max graduated on June 11, 1981. Both Max and his parents rejected the idea of continuing at CCLC during the pendency of the due process hearing. Instead, the Ms wanted a different special education program combining advanced academic work, vocational training, and therapy. No such special education program was offered by New Trier. In September of 1982, the Ms enrolled Max at Brehm Preparatory School, a residential facility for learning disabled and behavior disordered children. After several months of attendance at Brehm, Max developed acute psychiatric problems and was hospitalized at Hartgrove Hospital. Max was discharged to the Ridgeview Shelter Care Facility in Evanston, Illinois, on October 10, 1983, and received outpatient psychotherapy from Dr. Gary Phillips, a clinical psychologist. The Ms spent between $16,000 and $17,000 to place Max at Brehm and incurred approximately $3,500 in fees from Dr. Phillips.

Meanwhile, on October 13, 1981, Dr. Robert Monks conducted the due process hearing requested by the Ms. On October 16, 1981, Dr. Monks issued a decision revoking Max' graduation and ordering that services be continued and that an appropriate IEP be prepared. New Trier promptly appealed the Monks' decision and on February 12, 1982, the Illinois State Board of Education (ISBE) issued an Administrative Order reversing the hearing officer's decision. Both the hearing officer's opinion and the ISBE's Administrative Order found that Max had been denied an appropriate education with related services because New Trier failed to provide Max with the intensive psychotherapy recommended by the school district's psychologist, Dr. Traisman. The ISBE order reversing the hearing officer's decision to revoke Max' diploma and continue services was based on an alleged pleading defect on the part of the Ms.[4]

On October 26, 1982, the Ms filed their complaint in this Court. Although the Ms' initial complaint challenged the ISBE order on various federal and state statutory and constitutional provisions, this Court's four prior decisions limited the Ms' complaint to two basic claims under the EAHCA: (1) reimbursement from Local Defendants of the $8,855 expended by the Ms for Max' psychiatric treatment while attending New Trier; and (2) compensatory remedial educational services from all defendants to compensate Max for the alleged deprivation of EAHCA benefits while he attended New Trier and an injunction revoking Max' diploma to reestablish his eligibility under the EAHCA.[5]

---

**4.** In *Max M. IV,* this Court disagreed with the ISBE and ruled that the Ms had sufficiently stated their claim for compensatory educational services for Max at the administrative proceedings before the ISBE. This Court's finding that no waiver had occurred at the administrative hearing undercut the ISBE's sole reasoning for dismissing the Ms' claim for compensatory education. Thus, at both levels of the administrative review process, New Trier was found to

have denied Max a free and appropriate education because of its failure to provide Max with the recommended psychotherapy.

**5.** *See generally, Max M. v. Thompson,* 566 F.Supp. 1330 (N.D.Ill.1983) (Max M. I); *Max M. v. Thompson,* 592 F.Supp. 1437 (N.D.Ill.1984) (Max M. III); *Max M. v. Thompson,* 592 F.Supp. 1450 (N.D.Ill.1984) (Max M. IV).

## II. ISSUES PRESENTED

The issues raised by the Ms' motion for reconsideration and both parties' motions for summary judgment will be stated in turn. The Ms' motion for reconsideration asks this Court to review its prior rulings limiting the Ms' claim for reimbursement in light of the recent Supreme Court decision of *Burlington School Committee v. Department of Education,* — U.S. —, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). In *Max M. III,*[6] this Court placed two limitations on the Ms' claim for reimbursement of the $8,855 expended by them to provide Max with private psychotherapy while he attended New Trier. First, under the mandates of *Anderson v. Thompson,* 658 F.2d 1205 (7th Cir.1981), the Ms were required to show that the Local Defendants had acted in bad faith by failing to comply with the procedural safeguards of the EAHCA before they were entitled to make any claim for reimbursement under the EAHCA. *Max M. v. Thompson,* 592 F.Supp. at 1449.

Second, restrictions on the nature of services that may be provided by a psychiatrist under the EAHCA limited the Local Defendants' liability for the cost of privately obtained psychological services. *Id.* at 1444–45. Specifically, this Court held that the Local Defendants could be liable for no more than the cost of the service as provided by the minimum level health care personnel recognized as competent to perform the related service of psychotherapy. *Id.* The liability of the Local Defendants in such case was to be computed from the amount that such qualified personnel would normally and reasonably charge for the psychotherapy Max received. *Id.* If the Ms were not fully reimbursed after proving bad faith on the part of the Local Defendants, then the cost the Ms must incur is the cost of exercising their freedom to select more highly qualified personnel than the EAHCA requires. *Id.* at 1445. Thus, the Ms' motion for reconsideration raises three basic issues: (1) whether Fed. R.Civ.P. 60(b) allows reconsideration of *Max M. III* in light of *Burlington;* (2)

whether retroactive application of *Burlington* is proper; and (3) if so, whether the limitations announced in *Max M. III* survive *Burlington.*

Both sides motion this Court for summary judgment on the issues of compensatory education and reimbursement for private educational and therapeutic services for Max. Central to the parties' cross-motions is the question of whether Max received a free and appropriate education under the guidelines set forth in the EAHCA. Defendants argue that since they have offered to reimburse the parents for the cost of Max' private psychotherapy, Max received a free and appropriate public education with related services. Thus, defendants contend that since Max completed all requirements for graduation, Max is no longer entitled to additional educational services. The Ms, however, argue that they will not be made whole by receiving compensation for sums expended for Max' psychotherapy while at New Trier. Instead, the Ms contend that because defendants allegedly failed to address Max' social and emotional problems in his IEP, Max was deprived of a free and appropriate public education, irrespective of whether the Ms are compensated for the cost of Max' private psychotherapy. Accordingly, the Ms argue they are not only entitled to the $8,855 spent on private psychotherapy for Max, but are also entitled to full reimbursement for all sums expended by them on educational and theraputic services for Max since the date of his allegedly illegal graduation from New Trier. Thus, the issues this Court must decide are (1) whether Max was denied a free and appropriate public education with related services; and (2) if so, what relief is appropriate under the EAHCA.

## III. DISCUSSION

This Court will first address the issues raised by the Ms' motion for reconsideration and then turn to the questions presented by parties' cross-motions for summary judgment.

---

**6.** *See supra* note 5.

### A. *The Rule 60(b) Motion to Reconsider*

■ The Ms move this Court pursuant to Fed.R.Civ.P. 60(b) to reconsider its prior ruling in *Max M. III* in light of the recent Supreme Court case of *Burlington School Committee v. Department of Education*, —— U.S. ——, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Rule 60(b) reads in relevant part:

> (b) ... On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment order or proceeding for the following reasons: (1) mistake, inadvertance, surprise or excusable neglect; ... or (6) any other reason justifying relief from the operation of the judgment. The motion should be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment order, or proceeding was entered or taken....

Generally, a motion to vacate a judgment pursuant to Rule 60(b) is left to the discretion of the district court. *McKnight v. U.S. Steel Corp.*, 726 F.2d 333, 335 (7th Cir.1984). A Rule 60(b)(1) motion, filed within the time for appeal, calling the trial court's attention to an intervening controlling appellate decision is a proper means to allow the trial court to correct a decision that would otherwise be corrected by a timely appeal. *McKnight*, 726 F.2d at 336. Thus, to satisfy Rule 60(b)(1), the motion to reconsider must be filed within the time permitted to make an appeal on the judgment.

Although the Ms' Rule 60(b) motion was filed over one year after *Max M. III* was decided, this Court denied both parties' cross-motions for summary judgment, finding issues of material fact still remained. As such, *Max M. III* was not a final appealable order. Thus, no impediment exists to bar this Court from entertaining the Ms' motion for reconsideration in light of an intervening controlling Supreme Court decision.[7] Accordingly, this Court turns to the second issue raised by the Ms' motion to reconsider: whether retroactive application of the *Burlington* decision is proper.

On April 29, 1985, the United States Supreme Court held that a trial court has the authority under the EAHCA to require a school district to reimburse parents for their expenditures on private special educational services for their child if the court determines that such placement, rather than the IEP proposed by the school district, is proper under the EAHCA. *Burlington School Committee v. Department of Education*, —— U.S. ——, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Prior to *Burlington*, the law in the Seventh Circuit was that a school district could be held liable for reimbursement of expenses incurred in an appropriate private unilateral placement only if parents could prove that the district acted in bad faith by failing to comply with the EAHCA's procedural provisions in an egregious fashion, or where the district's proposed IEP presented a serious risk of injury to the child's physical health. *Anderson v. Thompson*, 658 F.2d 1205, 1213–14 (7th Cir.1981). This Court followed the *Anderson* decision in *Max M. III* and imposed the bad faith requirement as a prerequisite to the Ms' claim for reimbursement for the $8,855 they spent obtaining Max private psychotherapy while he attended high school. Thus, the rule applied in *Max M. III* appears contrary to the teachings of *Burlington*.

■ Defendants oppose the Ms' motion for reconsideration on the grounds that *Burlington* should not be given retroactive application. Defendants contend that the Supreme Court decision of *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971), mandates that the *Burlington* decision be applied on a prospective-only basis. In *Chevron*, the Supreme Court devised a three-part test to identify situations where civil,

---

7. Motions to reconsider in light of intervening controlling precedent have been entertained not only under subsection (1) of Rule 60(b), but also under subsection (6). *See e.g. DeFilippis v. Unit-ed States*, 567 F.2d 341, 343 n. 5 (7th Cir.1977). The Ms' motion appears to satisfy the requirements of either subsection of Rule 60(b).

nonconstitutional precedent should be applied on a prospective-only basis:

> (1) Does the decision "establish a new principle of law, either by overruling clear past precedent on which the litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed?"
>
> (2) Considering "the prior history of the rule in question, its purpose and effect," does retroactive application "further or retard" the operations of the rule?
>
> (3) Does retroactive application create "injustice or hardship" for one of the parties?

*Chevron,* 404 U.S. at 106–07, 92 S.Ct. at 355–56. Applying this three-part test to the facts before it, the *Chevron* Court ruled that a plaintiff's lawsuit should not be barred by the court's adoption, for the first time, of a more restrictive statute of limitations. *Id.* The Court reasoned that the plaintiff could not have known of a statute of limitations which did not then exist and refused to give retroactive effect to the newly espoused limitations period. *Id.*

The Seventh Circuit has held that since a presumption exists favoring retroactivity, all three *Chevron* factors must support prospective application in order to limit the retroactive effect of a decision. *N.L.R.B. v. Lyon & Ryan Ford Inc.,* 647 F.2d 745, 757 (7th Cir.1981). Addressing the first *Chevron* factor, defendants argue that *Burlington* establishes a new rule on reimbursement for unilateral placement which represents a clean break with the well established rule formally followed in a majority of the federal circuits.[8] Little doubt exists that *Burlington* marked a departure from the general rule against allowing reimbursement for expenses incurred by parents for appropriate unilateral placements, unless certain exceptional circumstances existed.[9] The *Burlington* test for reimbursement under the EAHCA is met when the trial court determines that the private unilateral placement, rather than the proposed IEP, is proper under the Act. The *Burlington* Court made no mention of any exceptional circumstances as a prerequisite to reimbursement. Since *Burlington* establishes "a new principle of law by overruling clear past precedent," defendants have met the first element in the *Chevron* test. *Chevron,* 404 U.S. at 106, 92 S.Ct. at 355.

With regard to the second *Chevron* criterion, defendants contend that retroactive application of *Burlington* would retard the purpose and effect of the "no reimbursement for unilateral placement rule" previously followed in the Seventh Circuit. *Anderson,* 658 F.2d at 1213–14. Although defendants are quite accurate in their contention that retroactive application would retard the purpose and effect of the *Anderson* rule, defendants misinterpret the focus of the second *Chevron* factor. The question under this factor is whether retroactive application would further or retard the operation of the newly announced rule. In *Burlington,* the Court stated that the EAHCA "was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives." *Burlington,* — U.S. at —, 105 S.Ct. at 2004. *Burlington* evinced a desire to facilitate rather than limit the handicapped child's right to a free and appropri-

---

**8.** Reimbursement was denied for unilateral placements under the EAHCA in the following cases: *Doe v. Anrig,* 692 F.2d 800, 810 (1st Cir.1982); *Stemple v. Board of Education,* 623 F.2d 893, 898 (4th Cir.1980); *Marvin H. v. Austin Independent School District,* 714 F.2d 1348, 1356 (5th Cir.1983); *Anderson v. Thompson,* 658 F.2d 1205, 1213 (7th Cir.1981); *Miener v. State of Missouri,* 673 F.2d 969, 980 (8th Cir.1982); *Mountain View-Los Altos High School District v. Sharron B.H.,* 709 F.2d 28 (9th Cir.1983); and *Powell v. Defore,* 699 F.2d 1078, 1081 (11th Cir. 1983).

**9.** Prior to *Burlington* the rule in the Seventh Circuit was that reimbursement for the parents' cost of obtaining services required under the EAHCA was only appropriate (1) where "the Court determines that the services in dispute were necessary to protect the physical health of the child," acted in bad faith by failing to comply with the procedural safeguards of [20 U.S.C. § 1415 (1976) ] in an egregious fashion. *Anderson v. Thompson,* 658 F.2d 1205, 1213–14 (7th Cir.1981).

ate public education by allowing reimbursement for proper unilateral placements when the child's IEP was found inappropriate. *Id.* Retroactive application would clearly further the operation of the *Burlington* rule by advancing its purpose and effect while prospective application would create hinderance. Defendants' inability to satisfy the second *Chevron* criterion dismisses any argument against the propriety of giving *Burlington* retrospective effect.[10] Accordingly, this Court will reconsider *Max M. III* in light of the *Burlington* decision.[11]

■ In *Max M. III* this Court held that sums expended by the Ms on private psychotherapy and diagnostic services for Max were recoverable from defendants only if the exceptional circumstances outlined in *Anderson* were proven. *Max M. III*, 592 F.Supp. at 1449. Specifically, *Max M. III* held that the Ms must show defendants acted in bad faith by failing to comply with the procedural safeguards enumerated in § 1415 of the EAHCA in an egregious fashion. *Id.* This Court observed that defendants did not seriously dispute their failure to provide Max with intensive psychotherapy after his sophomore year and held that the Ms' procedural rights under § 1415 were violated by the defendants. However, this Court was forced to deny the Ms' motion because the issue of bad faith was not appropriate for summary judgment. *Id.* at 1448–49. *Burlington*, as previously noted, eliminates the requirement of showing exceptional circumstances as a prerequisite to recovery. Under *Burlington*, parents can be reimbursed for expenditures incurred from a unilateral placement of their child in a private educational facili-

ty "if the court ultimately determines such placement, rather than a proposed IEP, is proper under the Act." *Burlington*, —— U.S. at ——, 105 S.Ct. at 2002–03. As no exceptional circumstances requirement survives *Burlington*, this Court amends its order in *Max M. III* to eliminate the necessity of showing defendants acted in bad faith.

■ The second limitation imposed in *Max M. III* arose out of the Ms' selection of a psychiatrist to provide Max with private psychotherapy. Although the EAHCA is interpreted to include psychotherapy as a related service school districts must provide, limitations exist on required medical services. Specifically, services provided by a licensed physician are limited to diagnosis and evaluation.[12] Due to the Local Defendants' failure to apprise the Ms of their rights under the EAHCA and provide Max with the psychotherapy he was identified as entitled to receive, this Court ruled that the Ms' uninformed selection of a psychiatrist would not bar their claim for reimbursement.

The EAHCA's limitation on physician-provided services was held to reflect a conscious effort on the part of Congress to limit costs by requiring a school district to provide only the minimum level of health care personnel recognized as legally and professionally competent to perform an EAHCA required service. Since many of the enumerated "related services" under the EAHCA could be provided by a physician or nonphysician, this Court reasoned that Congress intended to limit the *nature* of the services required rather than the personnel who provided the service. In

---

**10.** Moreover, the third *Chevron* factor, whether retroactive application creates any injustice or hardship, is also resolved in favor of the plaintiffs. *Anderson* was decided well after defendants' failure to provide Max with psychotherapy and decision to grant Max a diploma over the objections of the Ms. Even after *Anderson,* avenues existed for imposing liability on defendants for Max' psychotherapy given the procedural violations defendants committed while Max attended New Trier schools. *Max M. v. Thompson,* 592 F.Supp. 1437, 1445–48 (N.D.Ill.1984). Thus, this Court cannot agree that injustice or

hardship will occur if *Burlington* is applied retroactively.

**11.** In deciding that *Burlington* will apply, this Court is required to recognize the Ms' claims for sums expended on private education and related psychological services for Max after Max' graduation. This claim fits squarely within the unilateral placement rule in *Burlington* and will be addressed in this Court's ruling on parties' motions for summary judgment.

**12.** *See* 20 U.S.C. § 1401(17) (1978); 34 C.F.R. 300.13(b)(4) (1985).

that line of reasoning this Court held that where a school district failed to provide services required under the EAHCA and failed to properly inform the deprived EAHCA recipients of their right to seek review, the school district would be liable to reimburse the deprived recipients for the cost of privately obtained required services, even if a physician provided the services. Reimbursement for these physician rendered related services were subject to certain limitations. Specifically, the school district could be held liable for no more than the cost of the service as provided by the minimum level health care provider recognized as competent to perform the related service. The liability of the school district in such a case would be computed from the amount that such qualified personnel would normally and reasonably charge for the EAHCA services obtained privately by the deprived party. Thus, if the deprived party is not fully reimbursed, then the portion of the cost the deprived party must incur is the cost of exercising the freedom to select a special care provider.

The Ms in their instant motion argue that *Burlington* eliminates all reimbursement limitations under the EAHCA once it is found a school district proposed an inappropriate IEP. This Court disagrees. *Burlington* merely stated that § 1415(e)(2) of the EAHCA gave courts the remedial power to "order school authorities to reimburse parents for their expenditures on *private special education* for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Burlington*, —— U.S. at ——, 105 S.Ct. 2002–03 (emphasis added). *Burlington* did not consider whether full reimbursement should be required for the costs of physician administered related services, but was only concerned with privately supplied special educational services.

*Max M. III* represented an effort to reconcile the EAHCA's requirement that each child receive an appropriate and free public education including *related services* with the EAHCA's limitations on expenditures for medical services. To abandon the limitation on reimbursement for physician rendered related services in *Max M. III* would require this Court to completely ignore the clear language of the statute which limits medical services to diagnosis and evaluation. *Burlington* simply cannot be read to encompass the question of physician administered related services decided in *Max M. III*. Thus, the Ms' motion for reconsideration as to the reimbursement limitation imposed in *Max M. III* is denied.

### B. *The Rule 56 Motions for Summary Judgment*

A motion for summary judgment may only be granted when the moving party establishes that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *County of Milwaukee v. Northrop Data Systems*, 602 F.2d 767, 774 (7th Cir.1979). Although complete agreement may not exist with regard to all the facts asserted by the parties, this Court agrees that there are no material facts at issue and finds the facts set forth in Part I of this opinion undisputed. Thus, parties' motions are proper for summary judgment.

Both sides' cross-motions for summary judgment on the issues of reimbursement and compensatory education require this Court to determine whether Max received a free and appropriate education under the EAHCA. Recently, the Supreme Court spoke on the question of what constitutes a free and appropriate education within the context of the EAHCA. *Hendrick Hudson District Board of Educ. v. Rowley*, 458 U.S. 176, 203, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982). In *Rowley*, the Court developed a series of standards for judging whether a school district has met its obligations under the EAHCA. This Court will first address the standards outlined in *Rowley*, and then analyze the arguments of both parties in light of guidelines identified.

#### 1. The *Rowley* Decision

In *Rowley*, the Court was asked to determine whether Amy Rowley, a partially deaf student, was entitled to sign-language interpreter in her public school classes under

the requirements of the EAHCA. The parents of Amy read the EAHCA's requirement of a free and appropriate education to mean that the school district was to provide an IEP designed to maximize the potential of their handicapped child. Addressing this contention, the Court first turned to the language of the statute and determined that a free and appropriate education under the EAHCA consisted of the following:

> Educational instruction specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction. Almost as a checklist for adequacy under the Act, the definition also requires that such instruction and services be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP. Thus, if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a 'free and appropriate public education' as defined by the Act.

*Rowley*, 458 U.S. at 188–89, 102 S.Ct. at 3041–42. Noting that the EAHCA did not include any language prescribing a substantive standard of education to be accorded to handicapped, the Court reviewed the Act's legislative history and determined:

> By passing the Act, Congress sought primarily to make public education available to handicapped children. But in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful. Indeed, Congress expressly 'recognize[d] that in many instances the process of providing special education and related services to handicapped children in not guaranteed to produce any particular outcome.' S.Rep., at 11. Thus, the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to

guarantee any particular level of education once inside. *Id.* at 192, 102 S.Ct. at 3043.

Looking at the EAHCA's language and congressional history, the Court specifically rejected the parents' contention that the school district be required to provide a potential-maximizing education. *Id.* at 198, 102 S.Ct. at 3046. Instead, the Court concluded that the "basic floor of opportunity" required by the Act is met when the school district provides "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201, 102 S.Ct. at 3048. Although the Court refused to rule that every handicapped child being educated together with the general student body in the school's regular classrooms whose IEP allowed the child "to achieve passing marks and advance from grade to grade" was necessarily benefiting educationally, the Court identified such progress as a significant consideration. *Id.* at 206–07, n. 27, 28, 102 S.Ct. at 3050–51, n. 27, 28. Aside from adherence to the substantive requirements spelled out in the Court's definition of a "free and appropriate education," the Court noted that compliance with the EAHCA's procedural safeguards is also a factor. *Id.* at 206, 102 S.Ct. at 3050. The *Rowley* Court stated that compliance with such procedures insured parental involvement and thus created a check on the substantive contact of the proposed program. *Id.*

However, in pronouncing these guidelines, the Court cautioned judges against imposing their view of preferable education methods upon the school districts. Noting that courts lack the wisdom and experience necessary to resolve persistent and difficult questions of educational policy, the Court limited permissible inquiry to determining whether the specified requirements of the Act were being met. *Id.* at 208, 102 S.Ct. at 3052. Finally, to assist in reaching the determination of whether a free and appropriate education was being received, trial courts were urged to give due weight to the findings made during the administrative review proceedings. *Id.* at 206, 102

S.Ct. at 3051. Relating the factors and considerations identified to the facts in *Rowley*, the Court found that Amy was receiving an adequate education within the EAHCA's requirements and was not entitled to a sign language interpreter.

2. *Application of Rowley to Max M.*

■ Applying the arguments of the parties to the framework provided by the Supreme Court, this Court first turns to the checklist of criteria embodied in the *Rowley* analysis of a free and appropriate education. Putting to one side the issue of defendants' failure to provide Max with intensive psychotherapy after his sophomore year, the Ms argue that Max failed to receive a "truly personalized" program of instruction during his junior and senior years since Max' IEPs during that time paid inadequate attention to Max' refusal or inability to perform written work. Instead, the Ms contend that the IEPs focused almost entirely on Max' behavioral problems. Turning to the facts in this case, it is clear that Max was identified by the school district as having behavioral problems that took the form of anxiety and disorganization as well as a learning disability that related to Max' difficulty with written work. Dr. Traisman, the school district's psychologist, viewed Max as a bright child whose major difficulty was his ego. Max' lack of a strong self image was thought to be at the root of his social, emotional and academic difficulties with school. Dr. Traisman felt that before Max' learning disability could be successfully addressed, Max' ego needed to be strengthened through intensive psychotherapy.

Following the recommendation of Dr. Traisman, the school district prepared an IEP for Max' sophomore year which included intensive psychotherapy from Mr. Brull, New Trier's social worker. Although some dispute exists over the school district's willingness to provide Max with a male therapist during his junior and senior years, the school district either offered to provide a female therapist or now offers to compensate the Ms for the private therapy Max received during those years. Once the Ms agreed to the school district's repeated recommendation that Max be placed in special education, Max began to show academic improvement. In response to the difficulties Max experienced in the larger setting of New Trier West, the school district proposed and the Ms, with the assent of their private therapist, agreed to Max' placement at CCLC. While attending the highly structured and supervised environment at CCLC Max showed significant academic, social and emotional progress. Given the fact that this Court cannot impose its view of preferable educational methods upon the school district, this Court cannot hold that Max failed to receive a personalized program of instruction that allowed him to benefit educationally. Dr. Traisman stated that Max, in his opinion, was so emotionally disturbed that learning disability help would not be effective until Max' ego was strengthened. The school district adopted an educational method which was consistent with these concerns, and the Ms with the advice of their private psychotherapist agreed to his placement and program at CCLC. Although other methods may have existed for approaching Max' learning disability and behavioral difficulties, this Court finds that the school district provided Max with an adequate program of specialized education within the requirements of *Rowley*.

■ The Ms next argue that the school district failed to provide Max services consistent with his IEP. The Ms note that although Max' junior year IEP called for prevocational services, little time was spent on this area. Moreover, the Ms complain that although family therapy was a key feature in Max' overall program, the school district refused to offer the therapy at a convenient time. Addressing the first complaint, it appears that although an optimal level of prevocational services may not have been provided to Max, some attention was given to these concerns. New Trier secured part-time employment for Max which he maintained for about one year after leaving CCLC. Max was also being prepared to take college entrance exams by his core teacher at CCLC, Ms. Knox. Given the fact that prevocational skills did not appear to be a priority due to Max' general

academic abilities, it is not surprising that not much time was spent in this area. As to the Ms' second complaint, this Court does not believe that the EAHCA imposes any requirement on the school district to plan family therapy sessions completely around the schedules of the parents. After a series of missed sessions by the Ms, both the school district and the Ms agreed that the sessions were not proving beneficial and should be discontinued. This Court cannot say that this situation caused Max to fail to receive the services necessary to allow him to receive an educational benefit from his IEP.

■ Third, the Ms argue that the school district did not meet the State's educational standard for special education. The Ms point to a 1981 Illinois State Board of Education report that showed that some of New Trier's special education staff did not have certain required certificates and letters of approval on file with the ISBE. Defendants, however, note that this report does not state that these special education instructors do not have the required certifications and letters of approval, nor does it state that these instructors are not qualified to receive such accreditations. The report, defendants contend, simply indicates that the letters and certificates are not on file with the ISBE. This Court agrees with defendants. The ISBE report, without more, is inadequate to show that the school district did not meet the State's educational standard. Nowhere in the report does the ISBE reach such a conclusion. Moreover, none of Max' special education teachers were mentioned in the report. Thus, the Ms' third argument is dismissed.

As noted earlier, *Rowley* states that the student's IEP should be reasonably calculated to enable the student "to achieve passing marks and advance from grade to grade, if the child is being educated in the regular classrooms of the public education system." *Rowley,* 458 U.S. at 203–04, 102 S.Ct. at 3049. Presumably, this statement means that a student who is mainstreamed should receive the instruction and services necessary to advance from grade to grade in the regular classrooms. Even though Max was not mainstreamed into regular classrooms during his junior and senior years at CCLC, his grades indicate that he was benefiting from his CCLC placement and that Max' IEP was reasonably calculated to enable him to have the opportunity to achieve passing marks and advance from grade to grade. Max' core teacher at CCLC, Ms. Knox, noted that Max made great improvements during his junior year in achieving the goals in his IEP and by his senior year, was showing improvement in overcoming his writing disability. Ms. Knox also stated that Max met at least the minimum expectations she had for him in each of his senior year classes and exhibited a good level of social interaction with his classmates. Although defendants complain that the school district failed to adequately address his social and educational needs, the foregoing shows different. Given that the program provided to Max at the CCLC appears to meet the substantive requirements of *Rowley* with the exception of psychotherapy, this Court turns its attention to the procedural violations issue.

■ *Max M. III* addressed the question of whether the school district complied with the procedural requirements of the EAHCA. *Max M. III,* 592 F.Supp. at 1445–48. After reviewing the facts then asserted by the parties, the failures of the school district to comply with the required notice provisions of the EAHCA were clear. *Id.* at 1448. The school district repeatedly failed to provide the Ms with proper notice of their right to seek an impartial due process hearing to review the adequacy of Max' IEPs. Under the EAHCA and its corresponding federal regulations, whenever a local educational agency proposes or refuses to initiate or change the identification, evaluation, or educational placement of the child, prior notice of the parents' procedural rights written in language understandable to the general public must be sent by the school.[13] This requirement was never met because such written notice in

13. *See* 20 U.S.C. § 1415; 34 C.F.R. 300.504, 505    (1985).

generally understandable language was never provided to the Ms during Max' years at New Trier and CCLC. *Max M. III,* 592 F.Supp. at 1448.

The school district, however, now contends that although proper legal notice was never sent to the Ms, the Ms did have actual notice of their right to seek a due process hearing. Citing the deposition testimony of Max' psychotherapist, Dr. Rosenfeld, the school district notes that the Ms were informed by Rosenfeld of their right to seek review during Max' junior year. Defendants also point to the Ms' admission that the school district informed them that they were entitled to a due process hearing if Max' junior year placement at CCLC proved unsatisfactory. Thus, the school district contends that any violations that occurred were only of the letter and not the spirit of the EAHCA requirements.

The reason *Rowley* identified the existence of procedural violations as a factor in determining the adequacy of an EAHCA education was that Congress intended parental involvement in the formulation of a child's IEP to assure that appropriate services were provided to the child. *Rowley,* 458 U.S. at 209–09, 102 S.Ct. at 3052–52. Turning to the facts in this case, the evidence shows that the school district did involve the parents in developing Max' special education programs. Max was first identified by the school district as a special education student during his second semester freshman year. The school district recommended that Max be placed in two special education classes for the remainder of his freshman year. The Ms objected to the proposal as too drastic and wanted to keep Max mainstreamed with the general student body. Shortly thereafter, the school district renewed its urging for special education, and the Ms finally agreed.

A meeting with the Ms was held by the school district in June of 1978 to discuss Max' sophomore IEP, and the parties agreed on the special education and support services Max was to receive. Prior to Max' junior year, the Ms engaged Dr. Rosenfeld to give Max psychotherapy and discussed with Rosenfeld the possibility of placing Max in a special education resi-

dential facility. The Ms and Rosenfeld agreed, however, not to pursue this option. Rosenfeld and the Ms attended a meeting with the school district to discuss Max' junior year placement in August of 1979 where the CCLC placement was proposed. Rosenfeld felt that CCLC was a reasonable next step in addressing problems Max had experienced in the larger setting of New Trier West and the Ms approved of the placement. The Ms were informed at this meeting that if the CCLC placement did not work out, a due process hearing could occur. Finally, Max' senior year placement was discussed with and approved by Rosenfeld and the Ms.

The foregoing facts reflect a pattern consistent with the purpose of the EAHCA's notice provisions. Here, the parents were quite involved with assessing the educational and supportive services their child was to receive from the school district and had the professional advice of a psychiatrist familiar with the EAHCA. Although procedural violations of the EAHCA notice provisions occurred throughout Max' high school education, no program or placement was implemented without the Ms' involvement and consent. The actions of the school district, although not commendable, square with the basic policy concern of ensuring proper educational and related services through parent involvement. Thus, this Court is not prepared to hold that a free and appropriate education was denied Max solely on the basis of the school district's procedural violations.

■ The final argument raised by the Ms is that the school district's failure to provide Max with intensive psychotherapy during his junior and senior years deprived Max of a free and appropriate education. The Ms note that the school district's psychologist, Dr. Traisman, evaluated Max during his second semester freshman year and unequivocally recommended intensive psychotherapy for Max. Traisman stated in his report that unless the intensive psychotherapy was undertaken, "Max will not experience success socially, emotionally or academically." The undisputed facts show

no therapy was provided by the school district for Max after his sophomore year. Instead, the Ms were forced to purchase private psychotherapy from Dr. Rosenfeld at a cost to them of $8,855.

At the close of Max' senior year, the Ms exercised their right to a due process hearing and discontinued Max' psychotherapy sessions with Dr. Rosenfeld. Both the hearing officer and the ISBE specifically found that Max had been denied a free and appropriate education with related services because the school district failed to provide Max with the recommended intensive psychotherapy. The ISBE, however, reversed the hearing officer and denied relief to the Ms alleging that the Ms committed a pleading defect.[14]

Based on the foregoing facts, the plaintiffs must prevail on this issue. Max was denied a free and appropriate education under the EAHCA because of the school district's failure to provide Max with the recommended psychotherapy. Yet, reaching this conclusion does not entitle the Ms to full reimbursement for all sums they expended obtaining services for Max. Instead, this conclusion requires this Court to determine what relief is appropriate. § 20 U.S.C. § 1415(e)(2).

Aside from the issue of psychotherapy, this Court believes that the school district provided Max with a free and appropriate education within the guidelines set forth in *Rowley*. There may be little doubt that the program the Ms placed Max in after his senior year at CCLC was more beneficial to Max than the school district's proposed placement, but the school district is not required to maximize the potential of a EAHCA student. The school is only required to provide a program that will allow the child to benefit educationally. The

school district provided Max with such a program but for its failure to assure free psychotherapy. After considering all the undisputed evidence presented by the parties, this Court finds reimbursing the Ms for the cost of Max' psychotherapy to be appropriate relief.[15]

Although defendants repeatedly state that they are willing to reimburse the Ms for Max' psychotherapy according to this Court's ruling in *Max M. III*, they have offered no figures of what New Trier's qualified therapists would normally and reasonably charge for such therapy. According to *Max M. III*, defendants have the burden of coming forth with such evidence if they believe the amount charged by the private physician exceeds the amount qualified school personnel would have normally and reasonably charged. Nowhere in any of the two hundred plus pages of argument filed by defendants concerning this motion is there any proof that the $8,855 expended by the Ms on private psychotherapy exceeds the amount qualified New Trier personnel would have charged. Considering the fact that defendants time and time again state in their briefs that they are willing to reimburse the Ms for Max' psychotherapy, yet offer no proof that similar services could have been provided at lower cost by New Trier personnel, this Court orders Local Defendants to reimburse the Ms for the full amount of $8,855 with interest.

## IV. CONCLUSION

The Ms motion for reconsideration is granted, and both sides' motions for summary judgment are granted in part and denied in part. The defendants are ordered to reimburse the Ms for the $8,855 they

---

**14.** *See supra* note 4.

**15.** Because this Court finds that Max M. received an appropriate education under the EAHCA but for the school district's failure to provide free psychotherapy, the Ms' claim for reimbursement for sums spent obtaining special educational and therapeutic services after his graduation as well as the Ms' claim for compensatory remedial education is denied. Given the fact the Ms will be reimbursed for the private psy-

chotherapy Max received during his high school years, Max will have received an appropriate education with related services at public expense. With reimbursement, Max' graduation was appropriate, and Max is not entitled to further education at the public's expense. Moreover, since the Ms clearly refused to allow Max to remain at CCLC after his senior year, the school district cannot be held for failing to maintain Max' placement during the statutory review process.

spent obtaining private psychotherapy for Max during his junior and senior years of high school with interest and costs.

IT IS SO ORDERED.