Harold A. VANDER MALLE, Phyllis A. Vander Malle and Bruce A. Vander Malle, a handicapped child by his natural guardians, Harold A. Vander Malle and Phyllis A. Vander Malle, Plaintiffs,

v.

Gordon M. AMBACH, individually and in his official capacity as Commissioner of Education of the State of New York; Louis Grumet, individually and in his official capacity as the Assistant Commissioner of Education for Children with Handicapping Conditions of the State of New York; Willard A. Genrich, Edward J. Meyer, Kenneth B. Clark, Harold E. Newcomb, Emlyn I. Griffith, Mary Alice Kendall, Jorge L. Batista, Louis E. Yavner, Laura B. Chodos, Martin C. Barell, Louise P. Matteoni, Carlos Carballada, Floyd S. Linton and Salvador J. Sclafani, individually and in their official capacities as Members of the Board of Regents of the University of the State of New York; Frank Macchiarola, individually and in his official capacity as Chancellor of the Board of Education of the City of New York; Joseph G. Barkan, Miguel Montanez, Marjorie A. Lewis, Irene Impellizzeri, Robert J. Christen, Amelia Ashe and James Regan, individually and in their official capacities as Members of the Board of Education of the City of New York, Defendants.

No. 81 Civ. 1365(RJW).

United States District Court,
S.D. New York.

Aug. 26, 1987.

Arthur D. Zinberg, New York City, for plaintiffs.

Robert Abrams, Atty. Gen., State of N.Y. Dept. of Law, New York City, for State defendants; Marion Buchbinder, Asst. Atty. Gen., of counsel.

Peter L. Zimroth, Corp. Counsel, New York City, for City defendants; Susan R. Rosenberg, Asst. Corp. Counsel, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Harold and Phyllis Vander Malle, both individually and as the parents of Bruce Vander Malle, instituted this action against various education officials of the State of New York and the City of New York seeking damages and reimbursement for expenses incurred as a result of defendants' alleged violation of their affirmative statutory and constitutional obligation to provide their son Bruce a free appropriate public education.[1] Both parties have renewed cross-motions for summary judgment. For the reasons to follow, the Court grants plaintiffs' motion in part and denies it in part. The Court also grants defendants' motion in part and denies it in part.

## BACKGROUND

Bruce Vander Malle was born on November 24, 1961. Plaintiffs adopted him when he was three and one-half months old. At all time relevant to this action, Bruce suffered from a handicapping emotional disturbance diagnosed principally as chronic, undifferentiated schizophrenia.[2] He has a history of self-mutilation, emotional outbursts, and assaults against his peers and his parents. The present action concerns the responsibility of the respective parties under the Education for All Handicapped Children Act, as amended, 20 U.S.C. § 1401 et seq. (the "EHA" or the "Act") for the

---

1. Where appropriate, defendants Ambach, Grumet, Genrich, Meyer, Clark, Newcomb, Griffith, Kendall, Batista, Yavner, Chodos, Barell, Matteoni, Carballada, Linton and Sclafani will be referred to collectively as the State defendants. Similarly, defendants Macchiarola, Barkan, Montanez, Lewis, Impellizzeri, Christen, Ashe, and Regan will be referred to collectively as the City defendants.

2. As Dr. Robert Hook, Bruce's attending physician while he was at the Institute of Living in Hartford, Connecticut, explained the diagnosis, schizophrenia is a condition in which a patient has lost contact with reality and is unable to assess the effects of his behavior on the environment or on those around him. Chronic indicates that the patient has been suffering from the condition for a period of time and undifferentiated signifies that the condition does not fit into any of the other, classically recognized forms of schizophrenia such as paranoid schizophrenia. Deposition of Dr. Robert Hook at 8 (taken May 19, 1981) ("Hook Deposition").

cost, allegedly for Bruce's education, incurred by Bruce's parents to hospitalize him for two periods at Bellevue Psychiatric Hospital and St. Vincent's Hospital and to maintain him for nearly five years at the Institute of Living (the "Institute"), a residential psychiatric hospital in Hartford, Connecticut.

Bruce began his education at the Hudson Guild Nursery school in February of 1965 at the age of three and one-half years. From September 1966 to June 1967, he attended kindergarten at the Greek-American School. Following kindergarten, Bruce attended first, second, and third grades at the Cathedral School of Saint John the Divine. In September 1970, the Vander Malles transferred Bruce to P.S. 33 where he attended classes into the fourth grade. While in the fourth grade, Bruce was placed on half day sessions. In January of 1972 school officials placed Bruce on home instruction as a result of emotional and behavioral problems. In March of 1972, the Vander Malles had Bruce admitted to a psychiatric ward at Bellevue Hospital where he remained a patient until June, 1972. While he was hospitalized at Bellevue, Bruce attended P.S. 106, a New York City school located at the hospital. In June, 1972, Bruce was discharged from Bellevue and referred to Green Chimneys, a private residential school in Brewster, New York. Bruce remained at Green Chimneys until he graduated from the eighth grade in June, 1976. Bruce's stay

at Green Chimneys had been funded on a full-year basis partially by the State of New York and partially by Bruce's parents.[3]

The events which underlie this suit commenced once Bruce graduated from Green Chimneys. Bruce's parents enrolled him at the Adams School, a non-residential day school in New York City on September 16, 1976. On September 23, 1976, he was expelled for emotional and behavioral problems. Around September 27, 1976, plaintiffs met with members of the local education authority ("LEA") and the District 2 Committee on the Handicapped ("COH").[4] The members recommended that Bruce be placed in a class for emotionally handicapped students at Charles Evans Hughes High School, a New York City public school. Bruce attended classes from October 15, 1976 to October 27, 1976 when school officials asked Bruce's parents to keep him at home because of his emotional and behavioral problems.

Between November 1, 1976 and November 15, 1976, plaintiffs consulted Stella Chess, M.D., who performed an independent psychiatric evaluation of Bruce. She advised plaintiffs and the members of the LEA that a therapeutic residential placement would be "essential" for Bruce. Dr. Chess recommended the Institute in Hartford, Connecticut and the Devereux Foundation in Devon, Pennsylvania ("Devereux").[5] On November 25, 1976, Bruce was

---

3. This placement was funded under the Greenberg Law, a statutory predecessor of the present Education Laws.

4. The New York City Board of Education was Bruce's LEA. Plaintiffs reside within the jurisdiction of the District 2 Committee on the Handicapped ("COH"). The LEA established the COH to determine whether specific children within its jurisdiction were handicapped. On the basis of the nature of the handicap, the COH is to make recommendations for appropriate educational placements. *See* N.Y.Educ.Law § 4402.

5. In relevant part, Dr. Chess' letter stated:
Diagnostic impression is schizophrenia.
Bruce needs a therapeutic residential school—he cannot function except in a very predictable and controlled environment.
Ex. 4. In a letter to New York City education officials, a member of the psychiatric staff at

Bellevue likewise recommended a residential placement.
Dear Sirs:
We recommend that Bruce attend a small school in a residential setting away from home. He needs to be in a small classroom, because a large school population would present overwhelming stimulation for Bruce. He also needs to continue his current anti-psychotic medication, and have that monitored by a psychiatrist. With the above arrangements we foresee a good progress for Bruce, who is an able youngster, and has done well at Green Chimneys school for disturbed children over his Junior High School years. He will also need some individual psychotherapy to help him get along better with his peers. Last fall Bruce attended two private schools while staying at home, in close succession and only lasted less than two weeks in each, with subsequent admission here at Bellevue six

again hospitalized at Bellevue in the psychiatric department.

Plaintiffs applied to Devereux on November 30, 1976. In December, Devereux requested an opportunity for its staff to evaluate Bruce personally. Plaintiffs took Bruce to Devereux for evaluation on January 17, 1977. Devereux accepted Bruce after the evaluation and the same day, plaintiffs signed Devereux's Enrollment Contract by which they assumed personal responsibility for Bruce's placement.

On January 11, 1977, Dr. Chess, at plaintiffs' request, wrote to Mrs. Zelon of the Evaluation and Placement Unit of the COH and sent her a copy of Bruce's psychiatric evaluation. On January 28, 1977, the Bellevue psychiatric staff also recommended a residential educational placement for Bruce. The staff specifically noted that Devereux had accepted Bruce.

The COH recommended that Bruce be placed at Devereux for the period September 1977 through June 1978. Once the school had received copies of the New York State funding confirmation for Bruce on April 13, 1977, Bruce enrolled at Devereux on April 18, 1977. In the interim between Bruce's acceptance on January 17 and his enrollment on April 18, 1977, Bruce had remained at Bellevue at his parents' expense.

Bruce remained at Devereux from April 18, 1977 through June 23, 1978. Because Devereux was an out-of-state residential placement approved by the Commissioner of Education of the State of New York, the State funded Bruce's placement at no cost to his parents.[6]

While at Devereux, Bruce attended high school in the 9–10th grade program, taking subjects including English, Spanish, History, General Math, Biology and Physical Education. During his stay Bruce attended regular therapy sessions with Dr. Avrene

Brandt, Ph.D, and was placed on a regimen of the antipsychotic medications Haldol and Artane. Early in 1978, Bruce's behavior deteriorated. He assaulted fellow students, damaged school property, and threw a chair at his therapist. As a result of those episodes, Devereux advised the COH and plaintiffs in the spring of 1978 that it was unable to provide Bruce an appropriate therapeutic setting and notified them that it intended to disenroll Bruce effective June 23, 1978. The staff at Devereux recommended long term psychiatric hospitalization as soon as possible to protect Bruce, his peers and the school staff and further that Bruce "be hospitalized on a short term basis until New York and your local school district can provide an appropriate placement for him." Ex. 15.

Although the COH attempted to find an alternative placement for Bruce, none had yet been found when Devereux discharged him on June 23, 1978. Consequently, Bruce's parents had him admitted to St. Vincent's Hospital, an acute care facility in New York City. He remained at St. Vincent's, at his parents' expense, until August 1, 1978. Plaintiffs had not applied to the Family Court for funding for the summer of 1978. Meanwhile, the COH solicited a number of approved schools seeking to place Bruce. All but the Institute declined to accept him.

The Institute is an accredited psychiatric hospital which is fully staffed to treat a broad range of mental and nervous disorders. The Institute charges its patients a basic *per diem* rate which includes a room in a psychiatric ward, board, routine hospital services, floor duty nursing, professional services from the Institute's doctors, psychologists and staff, rehabilitation services, and participation in its Department of Rehabilitative Services ("DRS") programs. The Institute does not break down

weeks later. He has been accepted at Devereux.

/s/Anna Balas, M.D.
Resident in Psychiatry
Adolescent Impairment Services
Ex. 5.

**6.** Except for the months of July and August, 1977, the State funded the placement pursuant

to the EHA and the New York Education Law. The State funded the placement during July and August pursuant to an order from the Family Court under then section 232 now section 236 of the Family Court Act. *See* N.Y.Jud.Law—Court Acts § 236; N.Y.Educ.Law § 4406.

the cost for the specific items included in its *per diem* rate.

The facility offers a variety of educational and theraputic programs for its patients. As part of its program, the Institute operates an academic high school, accredited by the State of Connecticut, on its grounds for those patients who are capable of participating in the program. A separate tuition charge is made to attend the high school. Dr. John E. Gaisford, the Director of the Patient Academic Department and principal of the school described the purpose of the high school as being to provide formal education for the Institute's patients. The high school tuition charge does not include related services such as psychological counseling or evaluation which instead is provided directly by the Institute. Although a learning center, similar to resource rooms at public high schools, is available for those students with learning disabilities for whom it would be appropriate, a separate charge is levied for that service.

The Institute also offers occupational and physical therapy to all patients through its DRS program which conducts a variety of activities to teach patients skills. The activities include, among others, woodworking, leather working, pottery, photography, cooking, and physical education. Students attending high school can use credits earned in DRS programs for academic credits at the high school. To participate in either the secondary school or the DRS programs, patients must receive permission, in the form of a written prescription, from their attending physician.

At plaintiffs' request, the Institute informed the COH that Bruce was acceptable for admission and advised the committee that he could probably be admitted by the end of July 1978. The Institute also advised the COH of its then current charges for tuition and inpatient fees. On July 27, 1978, the COH met to consider Bruce's case. Mr. Vander Malle attended the meeting. At that time, the COH found that Bruce was a handicapped child suffering from "schizophrenia, chronic undifferentiated type" and that he would require antipsychotic medication. The COH further determined that Bruce would require a residential placement and recommended the Institute because "it appear[ed] to be the most appropriate residential and educational environment for Bruce at this time."[7] Ex. 22 at p. 2. At that time the Institute was on a list of residential out-of-state facilities approved by the Commissioner.[8] At

---

7. In two subsequent annual reviews, on August 13, 1979 and again on July 28, 1980, the COH again confirmed Bruce's placement at the Institute as "appropriate to the child's needs."

8. By letter dated August 31, 1979, after the COH had recommended that Bruce remain at the Institute but before the school year commenced on September 1, 1979, Assistant Commissioner of Education Louis Grumet informed the Institute that inasmuch as the Institute provided primarily medical treatment rather than educational services, it was to be removed from the list of residential schools approved by the State of New York. In that letter, Grumet reiterated the State's rationale for decertifying psychiatric hospitals.

Dear Dr. Conklin:

Thank you very much for your August 2, 1979 letter. Please excuse my delay in responding.

There has apparently been some confusion on the part of local school districts in New York about how they could provide education to seriously emotionally disturbed youngsters who were being treated in psychiatric hospitals. Some New York school districts have classified those children as handicapped children so that they could receive an education at public expense.

However, as you confirmed during our meeting, our information is that many of these children are so seriously in need of treatment that they can spend little, if any, time in a classroom. Consequently, I am confirming New York State's position that your hospital and the other hospitals at the meeting are not primarily education institutions, and therefore, will be dropped from New York State's list of approved schools for handicapped children.

If children in these hospitals improve to the point where they can be educated in schools which may be affiliated with your hospital, then the local New York State school district should contract with such a school pursuant to Section 3202(4) of the State's Education Law.

I hope this information is useful to you. If you have any questions, please do not hesitate to write.

Sincerely,
/s/Louis Grumet

Ex. 4r. Defendants did not notify the Vander Malles that the Institute had been dropped from the list of approved schools, nor did they offer

the conclusion of the meeting, the COH provided plaintiffs with a pamphlet entitled "Your Child's Right to an Education, A Guide for Parents of Handicapped Children in New York State" and discussed with Mr. Vander Malle COH procedures and parents' rights under the New York Education Law. The Vander Malles accepted the placement and signed the standard Parental Consent Form.

Under date of July 27, 1978, Dr. Hannah Flegenheimer, then the State Education Department Associate Coordinator for Regional Programs in the Division of Supervision, Education of Handicapped Children, wrote to the Institute advising it that Bruce had been reviewed by the COH and had been approved for placement at the Institute. The letter stated that his tuition would be funded by New York State.[9] A copy of the letter was mailed to plaintiffs.

On August 1, 1978, the Vander Malles assigned their health insurance benefits to the Institute to pay its charges. They also signed a financial agreement whereby they agreed to assume personal responsibility for the Institute's charges.[10] That same day, St. Vincent's Hospital discharged Bruce. He arrived at the Institute by ambulance.

Once Bruce was admitted to the Institute, a staff psychiatrist prepared a course of treatment for him. Dr. Hook, the physician who had assumed Bruce's care when Dr. Morris, his first treating physician left the Institute, explained the goal of this initial program.

Briefly, Dr. Morris had decided that what needed to be done for Bruce was that he had to be treated with a program that would involve—a program, the purpose of which would be to help him gain control over the previously described behavior, in an effort to improve his interpersonal relationships and his socialization skills, to the extent that he would be able to participate in a number of activities and relate better to those people around him that were important, in particular, his family.

It was Dr. Morris' idea at the time that that probably would need to involve individual psychotherapy, or drug therapy, and the use of highly structured environment.

\* \* \* \* \* \*

Individual psychotherapy is a therapeutic process where there is a one to one relationship between the therapist and the patient; thus, the name, individual. Psychotherapy, being difficult to define, but in general, an operational definition is an attempt to assist the patient to understand his behavior, and the effects that it has on other people and situations, in an attempt to provide him with what he needs to change that behavior, and make his responses more adaptive in the future.

Hook Deposition at 20–21. Bruce's individual program included continued drug therapy with Halperidol, Chlorpromazine and la-

---

Bruce an alternative placement. Nonetheless, plaintiffs did become aware, by at latest the spring of 1980, that the Institute was no longer on the Commissioner's list of approved schools. Although the Institute had been decertified, plaintiffs requested, and the COH continued to recommend on July 28, 1980, that Bruce be maintained at the Institute. Ex. 33, 38, 43, 44. The COH did not review Bruce's status in 1981.

9. In its entirety, that letter reads:
 Dear Dr. Houck:
 Bruce A. Van der Malle of 290 Ninth Avenue, N.Y.C. has been reviewed by the N.Y.C. Board of Education's Committee on the Handicapped and approved for placement at the Institute of Living.
 His tuition will be approved for funding by New York State.

Sincerely,
/s/Hannah Flegenheimer
Associate Coordinator for
Regional Programs
Ex. 4(j).

10. From August 1, 1978 until March 1980, the Vander Malle's private medical insurer paid the costs of Bruce's placement at the Institute. Thereafter, the Vander Malles asked the Institute to bill them directly. The State paid the Institute $5200 for Bruce's tuition at the Institute's high school for the academic year 1978–79. When Bruce did not attend the high school, the balance of that sum remained on deposit with the Institute.

ter Lithium Carbonate to control his outbursts.

When Bruce first arrived at the Institute, Dr. Morris placed him in the high school as part of his overall therapeutic program. The placement proved fleeting; he attended school for fewer than ten days during the two separate attempts. Bruce was intolerant of the high school setting, and acted out a number of hyperemotional outbursts. High school officials informed his treating physician of Bruce's outbursts and recommended that he be removed from the school until his behavior was controlled. His psychiatrist concurred.

In light of Bruce's inability to participate constructively at the high school and his anxiety over returning to the classroom, Dr. Hook reformulated his program with the intent of reintroducing the formal educational program at the high school slowly to avoid stressing Bruce. The program centered on the routine of the housing unit in which Bruce was living.

The unit routine is generally one of keeping the daily activities of the patients as structured as possible. In other words, getting up at the same time every morning, you know, taking care of their own personal needs, participating in a number of unit activities which are designed to improve their ability to relate to each other and to socialize, such as meetings. That's the unit routine. Then the other routine that would have been part of his typical day outside of the educational experience, would have been participating in an organized schedule of activities that are run by the department of rehabilitation services here at the hospital. They consist of a number of classes and supervised activities.

\*　　\*　　\*　　\*　　\*　　\*

[The daily activities] include eating together. They include a certain amount of self-maintenance of the living area, like, you know, keeping the room clean, and that type of thing. They include the activities that are, you know, inherent in that kind of a unit, such as obtaining and taking medications under staff supervi-

sion, and they include group activities, such as meetings, and any organized, you know, organized activities that might be determined by the patients themselves, acting collectively.

Hook Deposition at 37–39. Bruce participated regularly in the DRS programs, although his participation did vary depending upon his emotional condition.

During his stay at the Institute, Bruce's physicians encouraged Bruce and formulated his treatment toward his eventual participation in the formal high school program, but his variable yet continued outbursts and anxiety over school and resulting lack of cooperation prevented his return. The second time Bruce returned to the high school, his condition deteriorated to where "[h]e rapidly became explosive and discontrolled, and the school felt that they just couldn't handle that situation." Id. at 60. Despite the frustration experienced in returning Bruce to formal school classes, that goal remained a part of Bruce's therapy program.

I don't see anything that we could have or would have done differently under the circumstances. From that particular point on, I made no further attempts to send him back to the school, because whenever that subject came up, he exhibited the same kind of behavior even in response to the discussion, and attempts to reinstitute an organized program were abandoned pretty much by me.

I had them in the back of my mind, in terms of reinstituting them at some point, when I felt that his behavior was sufficiently under control, but it just never got there.

Id. at 64. As Dr. Hook summarized Bruce's stay at the Institute up until the time of the deposition in May of 1981, he had not ruled out Bruce's return to the high school. Id. at 107.

Throughout the ordeal, the Vander Malles informally pressed their argument that the State should have funded entirely Bruce's hospitalizations and placement at the Institute. Mr. Vander Malle first

wrote Irving Anker, the Chancellor of the New York City Board of Education, to object to the charges he was incurring to maintain Bruce at Bellevue.

Dear Chancellor Anker:

The New York City Board of Education, as represented by its Bureau of Child Guidance, Evaluation & Placement Units and Committees on the Handicapped, has, through its inertia and poorly conceived implementation of Section 4402 of Chapter 853 of the Education Laws, deprived our 15 year old, emotionally disturbed son of his right to a proper education setting from October 1976 to date—a period of over four months. In addition, because of the particular circumstances, our family is being subjected to a financial drain of catastrophic proportions. Our son Bruce continues to stay in Bellevue Psychiatric Hospital at a daily billing charge of $280. Their bill since November 26, 1976 amounts to $22,120. Of this, my major medical insurance covers 80%, but my share amounts to $4,424.

I have attempted to outline on the enclosed attachment the chronology of the circumstances which has gotten us nowhere in solving Bruce's educational needs for school year 76/77. June 30th is less than four months away, and we fear that the channels of a conciliatory meeting, an impartial hearing or whatever can effectively keep Bruce from the schooling that he asks of us—"Why can't I go to boarding school?"

As you can see, the Board of Education knew of our particular circumstances in October 1976. But they denied us the benefit of their counsel until we, through our own initiative, finally in January 1977 got the administrative wheels rolling.

\* \* \*

It is difficult to keep this story brief, but we sincerely petition you for an equitable solution to this matter of allowing Bruce to continue his education in accordance with his needs, and in a timely fashion. May we expect a response at your earliest convenience. Thank you.

/s/Harold and Phyllis Vander Malle

Ex. 7.

Once Bruce was placed at the Institute, Mr. Vander Malle first wrote Hannah Flegenheimer to clarify the funding arrangement. In a letter dated November 22, 1978, Flegenheimer specified that the State would fund only the tuition component of the Institute's charges.

Dear Mr. Vander Malle:

I am writing in response to your letter of November 5, 1978 concerning your son's present placement.

\* \* \*

Per my telephone conversation and letter to you concerning this funding issue, I informed you that the N.Y. State Education Department will pay for the tuition costs *only*. As I explained previously, the Institute of Living has chosen not to accept the state's rate for maintenance costs. Therefore, unless another agency pays for your child's maintenance, you are responsible for these costs.

I would advise you to contact the New York City Board of Education's Contract Aid Office concerning your reimbursement requests for transportation costs. At this point, you should *not* be paying the Institute of Living for education costs. If you have any further questions concerning your child's placement, please feel free to contact me at (212) 488–4450.

Sincerely,

/s/Hannah Flegenheimer

Ex. 4k. The Vander Malles also protested the State's decision to fund only the tuition component of the charges to Sandra Pinkerton of the State Education Department.

Dear Ms. Pinkerton:

As I mentioned to you, however, the approved PHC–5 form is not self-explanatory in that it only shows the dates 9/1/78 to 6/30/79 on the tuition line. It does not show any dollar amount next to the tuition dates. Neither dollars nor dates are shown on the maintenance line, although dates apparently don't have to be showing if they are the same as the period of enrollment. If it is to be read that no maintenance has been granted,

then it appears to be in violation of the N.Y. State education laws which state parents are not to personally bear the costs of their child's special education. Bruce's placement costs for the nine months to date exceed $37,000, which is being borne by us and our major medical insurance program. It has also cost us $10,673 for Bruce's 40–day stay at St. Vincent's Psychiatric Hospital because Devereux Foundation unilaterally disenrolled Bruce on June 23, 1978, while we were working with our Committee on the Handicapped to arrange a new placement (which turned out to be The Institute of Living).

All of the above leaves us with the same unresolved questions of a year ago—(1), why must we bear the costs ($10,673) and consequences for Devereux not following its contractual obligations with the N.Y. State Dept. of Education, and (2), why can't the funding for 78/79 at the Institute of Living be resolved? And of course, paperwork must soon be started for the 79/80 school year. To whom do we turn in the State Education Department hierarchy to expedite these matters....

/s/Harold A. Vander Malle.

Ex. 17. When these initial attempts to secure additional financing proved unsatisfactory, Mr. Vander Malle wrote to other state officials.

Dear Ms. Silver:

\* \* \* \* \* \*

I am concerning myself in this letter to the immediate and overwhelming financial situation that we presently are in, that of our paying the maintenance costs related to this state approved out-of-state residential placement (which is contrary to applicable law) because no one in the N.Y. State Education Department apparently will face up the reality of the situation. Enclosed is a copy of my letter to Ms. Pinkerton dated April 27, 1978 showing that seven months have gone and a PHC–5 form had finally been issued, ambiguous though it is. Ms. Pinkerton, after three weeks, apparently was nowhere in getting answers to my questions, so

my letter was forwarded to Messrs. Sawisse and Grumet on May 21, 1978 (copy enclosed). A month and a half later, after I telephoned Mr. Sawisse's office on July 3, 1979, I got a response that the State Education Dept. is meeting this coming Thursday, July 12, 1979 with representatives of the Institute of Living on the "problem" of reimbursement of maintenance costs.

I am certain that our son's case is not unique. Our initiative (but still complying with the prescribed procedures) in placing Bruce at the Institute of Living has undoubtedly given Bruce a full year already to get back to the point he was emotionally and medically when at Devereux Foundation in February 1978. So he as a person has benefitted from the move, but our family unit is in danger of bankruptcy because the *payment* of dollars is not coming from New York State but from us.

Please let is know what our next step should be....

/s/Harold A. Vander Malle

Ex. 21. In apparent exasperation, Mr. Vander Malle finally wrote Stanley Bierman, General Counsel of the Office of the Advocate for the Disabled informing him of Bruce's troubled passage through various schools. Bierman contacted the New York State Department of Education concerning funding for the placement at the Institute, again with no success.

Dear Mr. Vander Malle:

We have been in communication with the New York State Department of Education, Office of Special Education, concerning the cost of maintenance connected with the education of your son, Bruce. As we advised, the Department of Education believes that the education system should not be responsible for these expenses, because they consider the Institute of Living in Hartford, Connecticut, a hospital and not a school

Accordingly, we were unable to convince them that the cost of maintenance should not be charged to you. Therefore, based upon these facts, it would appear that the only way this dispute can

be resolved is by a decision of a court of law....

Very truly yours,
/s/Stanley Bierman
General Counsel

Ex. 23.

Throughout this time, plaintiffs never requested an official impartial due process hearing to challenge the funding of the placement as violating the statutory guarantee of a "free appropriate public education" ("FAPE") under the EHA.

During March of 1980, Mr. Vander Malle revoked the assignment he had made to the Institute under his insurance policy. On March 10, 1981, plaintiffs filed the instant action in this Court contending that defendants had violated their statutory and constitutional rights to a free and appropriate education for their son Bruce. They premised the action on Article 89 of the Education Law of the State of New York, N.Y.Educ.Law § 4401 *et seq.*, the EHA, section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, section 1 of the Civil Rights Act of 1871, 28 U.S.C. § 1983, and the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiffs also requested attorneys fees. *See* 42 U.S.C. § 1988. Because the Institute was threatening to discharge Bruce unless the substantial outstanding balance on his account was paid, plaintiffs moved by Order to Show Cause for a preliminary injunction. On August 3, 1981, the Court enjoined defendants to maintain Bruce at the Institute until an appropriate alternative placement could be found. The State defendants appealed. On March 4, 1982, the court of Appeals for the Second Circuit affirmed the Court's order conditioned on plaintiffs permitting defendants to have Bruce examined at the Institute by a qualified psychiatrist of their choosing.[11] *Vander Malle v. Ambach*, 673 F.2d 49 (2d Cir.1982). Dr. Ivan Villalon examined Bruce at the Institute and submitted a written evaluation dated August 10, 1982.

Presumably because this litigation was pending, Bruce's COH made no recommendation in 1981. The COH met again on August 18, 1982, to classify and recommend a placement for Bruce for the 1982–83 academic year. The COH recommended a placement at a non-public residential treatment center but made no specific recommendation. Because the COH had made no specific recommendation, plaintiffs requested an impartial hearing under the provisions of the EHA. On November 5, 1982, the hearing officer assigned to hear the dispute declined to act because the preliminary injunction issued in this Court continued in force. Plaintiffs appealed to the Commissioner of Education. The Commissioner of Education remanded the case for a second impartial hearing on February 7, 1983. The second hearing officer again failed to implement the COH's placement recommendation because no specific placement had been recommended. Plaintiffs appealed yet again to the Commissioner of Education. The Commissioner, in a decision dated June 3, 1983, determined that the controversy was moot inasmuch as Bruce, who had become twenty-one years old on November 27, 1982, would no longer be eligible for placement under the EHA after June 30, 1983.

On July 7, 1983, the Court vacated its preliminary injunction *nunc pro tunc* to June 30, 1983. The parties cross-moved for summary judgment. In a memorandum decision dated July 11, 1984, the Court direct-

---

**11.** Intermittently defendants have attempted to characterize this action as arising out of a reimbursement dispute between the State and the Institute rather than as one between the parties. As the circumstances indicate, however, the controversy is one between the Vander Malles and the State about what portion of the Institute's charges the Vander Malles and their insurance carrier should bear. Although it was not necessary to resolve the matter on appeal of the preliminary injunction entered in this Court, the Second Circuit previously framed the dispute between the parties as "potentially ... [concerning] what expenses the Act requires a state to bear for a child who may well be educable by means of special education provided in a residential setting but who also requires considerable psychiatric treatment for an acute [emotional] condition that currently makes his education possible only at brief intermittent periods." 673 F.2d at 51. Thus framed, this controversy does not directly involve the legitimacy of the State's action in removing the Institute from its list of approved schools.

ed plaintiffs to exhaust their administrative remedies and placed the case on its suspense docket pending completion of the state process. At plaintiffs' request, the Court ordered the case returned to the active docket.

In the present posture, plaintiffs seek damages and reimbursement for expenses incurred as a consequence of defendants allegedly having wrongfully deprived Bruce of a free and appropriate public education. Specifically, plaintiffs seek reimbursement and damages for three separate periods. The first consists of the time Bruce was hospitalized at Bellevue from October 27, 1976 when he was expelled from Charles Evans Hughes High School to April 18, 1977 when he was placed at Devereux. The second covers the time from June 23, 1978, the date Bruce was discharged from Devereux, until August 1, 1978, the date he was enrolled at the Institute. The final period consists of the nearly five years from August 1, 1978 when Bruce was enrolled at the Institute until this Court dissolved the preliminary injunction on June 30, 1983.[12] Both parties have renewed their motions for summary judgment on the basis of stipulated facts.

## DISCUSSION

### I. The Statutory Framework of the EHA.

The EHA provides federal assistance to state and local agencies for use in educating handicapped children. The Act conditions funding on the participating states having complied with certain substantive educational goals and having provided particular procedural protections. *See generally Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 179–84, 102 S.Ct. 3034, 3037–40, 73 L.Ed.2d 690 (1982). To qualify for federal assistance, a State must demonstrate that it "has in effect a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). To implement the free appropriate public education, the responsible State officials must prepare an individualized education program ("IEP"). *Id.* § 1401(18). The IEP, which is prepared at a meeting between a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child, consists of a written document containing

(A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

*Id.* § 1401(19). The local educational agencies must review and, if appropriate, revise a child's IEP at least annually. *Id.* § 1414(a)(5). The regulations implementing the EHA require that the responsible state educational agency or unit "insure that a continuum of alternative placements is available to meet the needs of handicapped children for special education and related services." 34 C.F.R. § 300.551(a).

When placements in conventional public institutions are unavailable or inappropriate, the state must place the child in private institutions and ensure that such placements occur "at no cost to their parents...." *Id.* § 1413(a)(4)(B)(i). In "all such instances the State educational agency shall determine whether such [private] schools and facilities meet standards that apply to State and local educational agencies and [shall insure] that children so

**12.** Plaintiffs have requested reimbursement in the following amounts:

| October 27, 1976 to April 18, 1977 | Devereux Application Fee | $ 95 |
| | Devereux Evaluation Fee | 250 |

| | Hospitalization | $21,616 |
| | Bellevue Diagnostic Fee | 225 |
| | | $22,186 |

| June 23, 1978 to August 1, 1978 | Psychiatric Hospital | $10,674 |

| August 1, 1978 to June 30, 1983 | Per Diem Expenses at the Institute. | |

served have all the rights they would have if served by such agencies." *Id.* § 1413(a)(4)(B)(ii).

The Act emphasizes that parents are to participate in developing the child's educational program and in assessing its efficacy and appropriateness. *See School Committee of the Town of Burlington v. Dep't of Education of Massachusetts,* 471 U.S. 359, 368, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985). To facilitate and effectuate parental participation and to ensure the proper resolution of substantive disagreements between parents or guardians and education officials, the Act imposes extensive procedural requirements. Section 615(b) entitles the parents "to examine all relevant records with respect to the identification, evaluation, and educational placement of the child," to obtain an independent educational evaluation of the child, to notice of any decision to initiate or change "the identification, evaluation, or educational placement of the child or the provisions of a free appropriate public education to such child," and to present complaints concerning those decisions or evaluations. 20 U.S.C. § 1415(b).

Complaints brought by parents or guardians must be resolved at an "impartial due process hearing." *Id.* §§ 1415(b)(2), (c). Disagreements between parents and the public agency regarding either the suitability of a placement or responsibility for its funding are to be resolved under procedures that comply with section 615. *Id.* § 1415; 34 C.F.R. § 300.403(b); *see Zvi D. by Shirley D. v. Ambach,* 694 F.2d 904, 907 (2d Cir.1982). If the initial hearing required by section 615 is held at the local or regional level, an appeal must lie to the state educational agency. *Id.* Thereafter "[a]ny party aggrieved by the findings and decision" made following the State administrative hearing has "the right to bring a civil action with respect to the complaint ... in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(e)(2).

■ In order to prevent disagreements between parents and administrators or le-

gal disputes from disrupting a child's educational program, the EHA provides that during the pendency of proceedings conducted pursuant to section 615(e)(3), the child "shall remain in the then current educational placement." 20 U.S.C. § 1415(e)(3). This subsection, however, does not obligate the state to fund placements made unilaterally by the parents. Parents who place their child in a private school without the consent of the school board do so at their own risk. *School Committee of the Town of Burlington v. Dep't of Education of Massachusetts,* 471 U.S. at 368, 105 S.Ct. at 2002; *see, e.g., Rowe v. Henry County School Board,* 718 F.2d 115, 119 (4th Cir.1983); *Zvi D. by Shirley D. v. Ambach, supra,* 694 F.2d at 908; *Stacey G. v. Pasadena Independent School District,* 695 F.2d 949, 955 (5th Cir.1983); *Board of Education of the City of New York v. Ambach,* 612 F.Supp. 230, 234 (E.D.N.Y.1985).

In 1976, New York amended its laws to comply with the substantive and procedural strictures of the EHA. 1976 N.Y.Laws Ch. 853. Under the amended law, a local Committee on the Handicapped ("COH") determines whether a child is handicapped and, along with the local school district, formulates an IEP. *See* N.Y.Educ.Law § 4402.1. The COH is directed to review and to evaluate all relevant information about each child and to make recommendations as to appropriate education programs and placements. The board of education or trustees of each school district are required "to furnish suitable educational opportunities for handicapped children by one of the special services or programs listed in [N.Y. Educ.Law § 4401.2]." *Id.* § 4402.2(a). The "special services or programs" may include contracts with private residential schools which have been approved by the commissioner and which are outside the state. *Id.* § 4401.2. The individualized needs of the handicapped child determine which of such services must be provided. *Id.* § 4402.2(a).

■ Parents who object to determinations made by the Commissioner of Education or the local COH first apply to the

local board of education for an impartial hearing and, if the determination of the hearing is still not satisfactory, they then must appeal that decision to the Commissioner of Education.[13] Thereafter, aggrieved parents may seek relief in the federal courts.

## II. Jurisdiction.

### A. Proper Causes of Action.

As set forth above, the EHA establishes an elaborate and detailed procedural mechanism to implement and protect the rights of handicapped children. In light of the detailed procedural protections accorded by the statute, "where the EHA is available to a handicapped child asserting a right to a free appropriate public education, based either on the EHA or on the Equal Protection Clause of the Fourteenth Amendment, the EHA is the exclusive avenue through which the child and his parents or guardian can pursue their claim." *Smith v. Robinson*, 468 U.S. 992, 1013, 104 S.Ct. 3457, 3469, 82 L.Ed.2d 746 (1984). In addition, whenever a remedy that might be provided under section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, is provided with more clarity and precision under the EHA, a plaintiff may not circumvent or enlarge on the remedies available under the EHA by resort to § 504. *Id.* 468 U.S. at 1021, 104 S.Ct. at 3473.

■ At base, plaintiffs' contentions all concern substantive obligations of the defendants under the EHA to pay for Bruce's placements at the Institute and for his hospitalization at Bellevue and St. Vincent's. Those claims thus arose solely under the EHA. The supposed violations to pay for Bruce's placements, even were they willful, could be reviewed under the procedures adopted by the State of New York to comply with the EHA. Nowhere do plaintiffs

contend that defendants prevented recourse to those procedures. Accordingly, inasmuch as plaintiffs could have redressed the violations they now assert under the EHA, section 1983 is not available. *See Gerasimou By Gerasimou v. Ambach*, 636 F.Supp. 1504, 1508–09 (E.D.N.Y.1986); *cf. Quackenbush v. Johnson City School District*, 716 F.2d 141, 147–48 (2d Cir.1983) (official misconduct which deprived plaintiff of the procedures of the EHA is reviewable under section 1983), *cert. denied*, 465 U.S. 1071, 104 S.Ct. 1426, 79 L.Ed.2d 750 (1984). Accordingly, the Court grants that portion of defendants' motion seeking to dismiss all of plaintiffs' claims except those premised on the EHA.

### B. Exhaustion.

■ "The philosophy of the Education for All Handicapped Children Act is that a plaintiff must first exhaust the state administrative remedies provided under the Act, including the administrative appeals provisions, before bringing an action in federal court to challenge the evaluation and placement of a child." *Riley v. Ambach*, 668 F.2d 635 (2d Cir.1981). Unless plaintiff has exhausted the administrative remedy, the federal courts lack jurisdiction to hear the case. In *Riley*, the panel specifically noted that two important policies, allowing expert administrators to focus and illuminate the issues to be considered by the courts and providing the state an opportunity to correct official abuse without the need to resort to costly and expensive litigation, underlie the exhaustion requirement. *Id.* Despite the strong requirement of exhaustion, traditional exceptions, including legal or practical futility or the inadequacy of the remedy, excuse compliance. *Id.* 668 F.2d at 640–41; *see S–1 By*

---

13. As the appropriate section of the Education Law provides:

 If the recommendation of the committee on special education is not acceptable to the parent or person in parental relationship of a child, or if the committee or board of education or trustees fails to make or effectuate such a recommendation within such periods of time as may be required by regulations of the commissioner, such parents or persons in

 parental relationship shall notify the board of education of this situation and the board shall appoint an impartial hearing officer to hear the appeal and make a determination within such period of time as the commissioner by regulation shall determine.... An appeal to the commissioner will lie from any determination of the impartial hearing officer. N.Y.Educ.Law § 4404(1).

*and Through P–1 v. Turlington*, 646 F.Supp. 1179, 1184 n. 9 (S.D.Fla.1986) (quoting the remarks of Senator Williams).

In its decision dated July 11, 1984, the Court determined that, on the record available to it, plaintiffs had failed to exhaust their remedies or to demonstrate an adequate justification for resorting to the federal courts rather than employing available state administrative procedures in the first instance. The Court specifically noted, however, that it would reconsider its disposition if plaintiff could demonstrate either that there never existed a possibility of a favorable administrative decision on their claims or that administrative relief would now be barred.[14]

Plaintiffs now renew and elaborate arguments that exhaustion was neither possible nor required. In essence they contend that (1) no administrative remedy existed to challenge the Commissioner's funding determination (2) defendants never advised them of the appropriate administrative procedures, and (3) that exhaustion was excused inasmuch as (i) the process of review has proved to be slow and ineffective and (ii) because the Commissioner had predetermined the issue thereby rendering the administrative procedures futile. The Court will address these arguments in turn.

1. Availability of Administrative Remedies.

■ Plaintiffs argue first that inasmuch as the local COH recommended, and they accepted, the proposed placement at the Institute, no reviewable controversy existed and hence they could not have resorted to the appropriate administrative proce-

dures. The position strikes the Court as disingenuous.

The administrative proceedings exist to challenge determinations reached by either the local COH or the Board of Education. Thus if the parents and the local COH agree on a recommended placement, but the Board of Education rejects that placement, the parents may request a review of that decision. *Riley v. Ambach, supra*, 668 F.2d 635; *Gregg B. v. Board of Education of Lawrence School District*, 535 F.Supp. 1333, 1336 (E.D.N.Y.1982).

Moreover, funding as well as placement is clearly reviewable. Because the EHA guarantees both a free and appropriate education, the due process procedures required of the states are available to review disputes as to either the propriety of a particular placement or its cost to the parents. As Senator Williams, the chief sponsor of the bill in the Senate, remarked, "[t]he language referring to 'free appropriate education' has been adopted to make clear that a complaint may involve matters such as questions respecting the child's individualized education program, questions of whether special education and related services are being provided without charge to the parents or guardians, questions relating to whether the services provided a child meet the standards of the state education agency, or any other question within the scope of the definition of 'free appropriate public education.'" 121 Cong.Rec. 37415 (1975).

In this instance, the State approved Bruce's placement at the Institute and funded the tuition component of the

---

**14.** Defendants argue that in its July 11, 1984 decision the Court found that plaintiffs had failed to exhaust without adequate justification and that the finding is now law of the case and furthermore disposes of this action. Defendants' argument, however, misconstrues the reach and import of the doctrine of law of the case. The doctrine involves distinct sets of problems, but its rules foster the common purpose to promote "consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4478 (2d ed. 1981) ("Wright & Miller"); *see generally* 1B J. Moore, *Moore's*

*Federal Practice* ¶ 0.404 (2d ed. 1984). Because the doctrine depends upon a prior *final* decision of an issue or claim by the court or by an appellate tribunal, "[r]ulings that simply deny extraordinary relief for want of a clear and strong showing on the merits, or that are avowedly preliminary or tentative, do not trigger law of the case consequences." 18 Wright & Miller § 4478. Accordingly, the Court's preliminary determination of the exhaustion question no more binds it in this instance than a decision on a temporary restraining order or preliminary injunction would have determined the outcome of the proceedings on the merits.

charges made, but refused to pay the *per diem* charges which amounted to by far the largest portion of the Institute's cost. Even though the Vander Malles did not dispute that Bruce's placement at the Institute was appropriate to his educational needs, they could have utilized the administrative procedures to object to the State's position that they would be responsible for the entire cost of the placement except for tuition. *See Antkowiak by Antkowiak v. Ambach,* 621 F.Supp. 975, 977–78 (W.D.N.Y.1985). Accordingly, an appropriate procedure existed under New York law to review the funding determination.

### 2. Notice.

█ Defendants also adequately notified the Vander Malles that the proposed placement at the Institute included only Bruce's tuition and not his *per diem* expenses. As the Court noted in its earlier decision, plaintiffs had been apprised as early as July 27, 1978 by a copy of a letter from Dr. Flegenheimer to Dr. Houck at the Institute that defendants would pay for only Bruce's tuition at the Institute and not for the *per diem* charges.[15] Richard Aldinger, the patient account manager at the Institute confirmed this understanding with Mr. Vander

**15.** Dr. Flegenheimer amplified the State's position in a second letter dated November 22, 1978. *See supra* p. 1024.

**16.** The pamphlet explained what decisions could be appealed, how to obtain an impartial hearing concerning recommendations, and how to appeal the decision of the impartial hearing officer.

> Your district must give you an opportunity to question or challenge recommendations and decisions about your child's educational program.
>
> * * *
>
> If you do not agree with the recommendation of the Committee, you have the right to request a hearing which is a formal, legal procedure. To do this, send a letter to your board of education.
> Do it within *10 school days* of the date that you received the notice of the recommendation that you are challenging. Keep a copy of the letter.
> Once the board has received your request, it must arrange for a hearing. it is up to the school district to make certain that the following procedures are followed:

Malle in a telephone conversation on August 1, 1978. Deposition of Richard Aldinger at 491. Plaintiffs therefore had timely notice of the State's determination.

Plaintiffs knew as well how to implement the procedures New York had provided to review decisions made by the COH or by the State Department of Education. The memorandum of the July 27, 1978 meeting of the COH at which the committee recommended that Bruce be placed at the Institute contains the notation that "Parents Rights and COH Procedures were reviewed with Mr. VanderMalle. The pamphlet 'Your Child's Right to an Education' helped to focus and clarify the ideas. Mr. Vander-Malle was given a copy to take with him." Ex. 12. As required, the pamphlet explained in layman's terms a parent's right to challenge a determination of the COH or the State Board of Education and outlined the procedures to follow to do so.[16] Accordingly, inasmuch as the State of New York had provided an adequate procedural mechanism to appeal the decision on Bruce's funding and plaintiffs were aware of that procedure, plaintiffs were obligated to exhaust the available state remedy unless otherwise excused.

> * * *
>
> After both sides have presented their cases, the hearing officer must make a decision. A copy of the decision must be mailed to you and to the board of education within 45 calendar days of the date that the board of officers received the initial request for a hearing. The hearing officer's decision must be based only on what occurred at the hearing. It must inform you and the board of education of your right to appeal the decision to the Commissioner of Education.
>
> * * *
>
> If you are dissatisfied with the decision of the impartial officer, you have a right to appeal to the Commissioner of Education. It is not necessary to hire a lawyer to do this. However, in order to bring an appeal to the Commissioner, you must follow certain procedures.

Ex. 12 at 15–16; *see* 8 N.Y.Comp.Codes R & Regs. §§ 200.5(c), 279.2(b). Moreover, it would appear from Mr. Vander Malle's March 10, 1977 letter to Chancellor Anker that plaintiffs were already aware of rights that they had to challenge recommendations concerning their son's placement.

### 3. Excuses for Failing to Exhaust.

#### a. Speed and Effectiveness.

■ While plaintiffs assert that the procedures provided under New York law are cumbersome and ineffective, they submit nothing to substantiate that argument. On their face, the procedures require that the school district hold an impartial hearing and reach a decision within forty-five days and that the Commissioner act on an appeal from such a decision expeditiously. Aside from conclusory assertions, plaintiffs have offered the Court nothing to indicate that, in practice, the procedures require more time. Accordingly, this contention must be rejected.

#### b. Futility.

Plaintiffs concentrate their argument primarily on the proposition that, since the Commissioner had predetermined the funding issue, they could not achieve a favorable administrative determination and therefore resort to the administrative procedures would have been futile.

■ Exhaustion is not normally required to permit officials to review a case as an exception to a previously promulgated rule of general applicability. Within this circuit, however, questions of exhaustion under the EHA are strictly interpreted. Thus that education officials have adopted a policy which would, on its face, decide a parent's application adversely does not render recourse to the administrative procedures futile since the responsible state officials might make an exception to the policy in a sufficiently compelling case. *Riley v. Ambach, supra,* 668 F.2d at 642 (policy against residential placement); *Lombardi v. Ambach,* 522 F.Supp. 867, 870–71 (E.D.N.Y.1981); *see Parks v.*

*Pavkovic,* 536 F.Supp. 296 (N.D.Ill.1982) (attacking adequacy of state procedures), *aff'd,* 753 F.2d 1397 (7th Cir.1985). As the Second Circuit noted in this very case, however, despite this further restriction, exhaustion is not required when the appropriate agency has already considered the circumstances of an individual case and nonetheless declined to make an exception.

■ On reconsideration, the Court determines that the Vander Malle's pursuit of administrative remedies would have been futile. The COH made, and plaintiffs accepted, a recommendation to place Bruce at the Institute, albeit on the condition that the State would pay only the tuition component of the expense and not the *per diem* charges. At the time the recommendation was made, the Institute was still an approved out-of-state residential school.[17] Although they accepted the placement and seemingly acquiesced in the condition that they pay the *per diem* charges by assigning their insurance policy to the Institute, as noted at length above, the Vander Malles made consistent and repeated attempts to challenge the State's decision not to pay that portion of the expense. Through that informal procedure, plaintiffs presented the state defendants the exact circumstances of Bruce's case, including the facts that plaintiffs had unsuccessfully sought to place him elsewhere and that his previous placement at Devereux had ended disastrously. On the facts then known, the Commissioner nonetheless declined to revise his position on the State's liability for any of the expenses involved in Bruce's placement at the Institute except that for tuition. Accordingly, the Commissioner had considered the precise facts of this case and nonetheless declined to approve funding but rather simply informed the

---

17. Shortly thereafter, however, the Commissioner dropped the Institute from the list of approved schools. In a letter to Bruce's local COH dated March 13, 1980, Hannah Flegenheimer belatedly informed the COH that it could not legally contract with the Institute and that the COH should review Bruce's status as quickly as possible to determine whether Bruce required psychiatric hospitalization or whether he should be placed in an alternative facility whose primary function was education. Although Flegen-

heimer's letter was included among the exhibits to the action neither party argues its significance presumably because plaintiffs do not contend that the Commissioner of Education could not remove the Institute from its list of approved schools for the reasons stated in that letter but only the narrower issue that once the local COH made the recommendation at a time when the Institute was on the approved list, New York became obligated to fund the placement.

local COH to consider alternative placements. Given the Commissioner's previous decision on the facts of Bruce's case, the possibility that he would nonetheless reconsider, find Bruce's case a compelling one, and reverse himself on administrative review was nonexistent.[18]

Under the circumstances of this case, excusing exhaustion does not undermine either of the policies the requirement is intended to serve. *See Stanger v. Ambach*, 501 F.Supp. 1237, 1239 (S.D.N.Y. 1980) (exhaustion is not required when it would not serve the purposes behind the doctrine). The Vander Malle's informal but nevertheless persistent efforts to overturn the Commissioner's decision provided him numerous opportunities to correct the alleged illegality of his actions. He declined to do so. The question in this case, what responsibility the State of New York should bear for Bruce's charges at the Institute, involves principally legal rather than factual determinations which the Court is quite adequately equipped to hear and which would not have been significantly illuminated on administrative appeal.[19]

See *McKenzie v. Jefferson* 566 F.Supp. 404, 407 (D.D.C.1983).

Because plaintiffs through informal petitions and requests presented the Commissioner with the exact details of the instant case and he nevertheless declined to fund anything other than the tuition component of Bruce's placement at the Institute, resort to the administrative procedures would have been futile. That futility excuses their failure to exhaust. Accordingly, the Court determines that it has jurisdiction to proceed to the merits of the EHA claims in the instant action.

II. The Merits of Plaintiffs' Claims.

A. Summary Judgment Standards.

 Nothing in the language or legislative history of the EHA precludes a court from deciding appeals on the basis of summary judgment. *Victoria L. By Carol A. v. District School Board of Lee County, Florida*, 741 F.2d 369, 372 (11th Cir.1984). While it is available, a court may nevertheless grant the extraordinary remedy of summary judgment only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the

---

**18.** The fact that the Commissioner had previously declined to grant relief to Bruce distinguishes *Gregg B. v. Board of Education*, 535 F.Supp. 1333 (E.D.N.Y.1982). Plaintiffs in that case never presented their son's circumstances to the Commissioner before filing suit.

*Lombardi v. Ambach*, 522 F.Supp. 867 (E.D.N.Y.1981), turns on a different exhaustion point likewise inapplicable here. In *Lombardi*, plaintiffs challenged the Commissioner's determination that a local school board could not contract to place a child with an unapproved school. When the Commissioner disapproved the placement which plaintiffs and the COH had agreed upon, the local school board's counsel appealed the legal question of its authority to contract with an unapproved school. It does not appear that the local board argued the circumstances of the proposed placement or that the state Board of Education considered them. *Id.* 522 F.Supp. at 871. Once the Commissioner denied the appeal and after the local COH had accordingly denied plaintiff's preferred placement at Trinity-Pawling, plaintiffs unilaterally placed their child at Trinity-Pawling and commenced an Article 78 proceeding seeking reimbursement of their expenses. In that action they apparently did argue that their preferred placement was the only appropriate one. *Lombardi v. Nyquist*, 63 A.D.2d 1058, 406 N.Y.S.2d 148 (3d Dep't.), *leave to appeal denied*, 45 N.Y.2d 710, 409 N.Y.

S.2d 1029, 381 N.E.2d 616 (1978). By unilaterally placing their child, plaintiffs necessarily interjected the "central, and contested issues of fact in the controversy [of] whether Trinity-Pawling was the only educational placement appropriate to meet plaintiff's special educational needs." Once the focus of the controversy became the appropriateness of the placement at Trinity-Pawling rather than the legality of contracting with an unapproved school, the district court properly declined to hear the controversy because that "determination should have been made after ample investigation and a hearing, either before the committee on the handicapped or the board of education." *Lombardi v. Ambach, supra*, 522 F.Supp. at 871.

This case, by contrast, has never involved the question of whether Bruce's placement at the Institute met his educational needs but concerns only whether the State of New York or Bruce's parents are to be held liable for its expense.

**19.** At this point plaintiffs are requesting only that the Court determine the threshold issue of liability. Even should the Court find liability, the question of damages again concerns primarily legal questions of which services provided to Bruce might reasonably be considered related or supportive services within the meaning of the Act and which would then properly be defendants' responsibility.

movant is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)), *cert. denied,* —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). While the movant faces a difficult burden to succeed, motions for summary judgment, properly employed, permit a court to terminate frivolous claims and to concentrate its resources on meritorious litigation. *Knight v. U.S. Fire Insurance Co., supra,* 804 F.2d at 12. The motion then

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). With the foregoing standards in mind, the Court turns to consider the parties' respective contentions.

**B. The EHA Statute of Limitations.**

■ As noted previously, plaintiffs contend that defendants violated the EHA and deprived Bruce of his statutory right to a free and appropriate education on three separate occasions. The first alleged deprivation began on October 27, 1976, when Bruce was admitted to Bellevue after officials at Charles Evans Hughes High School requested that the Vander Malles keep

Bruce home, and continued through April, 1977 when he was discharged from Bellevue to attend Devereux. The second episode occurred between June 23, 1978, when Bruce became a patient at St. Vincent's Hospital after being disenrolled at Devereux, and August 1, 1978 when Bruce enrolled at the Institute. The third and most significant period concerns Bruce's placement at the Institute which began on July 27, 1978 and continued nearly five years through July 30, 1983. Plaintiffs commenced this action March 10, 1981.

The EHA contains no statute of limitations. Accordingly, the federal courts are required to apply the statute of limitations applicable to the most closely analogous state cause of action. *See Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). In *Adler By Adler v. Education Department of the State of New York,* 760 F.2d 454, 457 (2d Cir.1985), the court of appeals described an action under section 1415(e)(2) of the EHA as "essentially an appeal from administrative proceedings previously held first by the COH and followed by an intermediate appeal to the Commissioner." The panel analogized such an action to an Article 78 proceeding to review procedural irregularities and accordingly held that Article 78's four month statute of limitations applied to such actions. The panel noted as well that significant policy considerations underlying the EHA warranted the application of the shorter four-month statute of limitations.

> While in this case the only issue pending is one of dollars-and-cents reimbursement to the parents, our ruling of course would affect all section 1415(e)(2) actions. A three-year period would include at least three annual reviews and one triennial reevaluation under N.Y.Educ.Law § 4402(1)(b)(3)(d), so that the annual determination to be reviewed would be a hoary one indeed. The four-month statute applicable to proceedings under Article 78 ... would result in annual review being reviewed before so much of the school year is past as to make the issues academic.

*Id.* at 460.

A state's method of computing and tolling the borrowed statute of limitations ap-

plies as well to the federal court action. The four-month limitations period for review of an administrative determination, either in the nature of certiorari or by mandamus, begins to run when the administrative determination becomes "final and binding," without regard to any demand or request that the petitioner might make upon the respondent.[20] *See* 8 J. Weinstein, H. Korn & A. Miller, *New York Civil Practice* ¶ 7804.02 (1987). The applicable New York regulations require aggrieved parents to register objections to either placement or funding decisions by writing to the school Board within ten days of the COH's decision. So measured, the statute of limitations bars the majority of plaintiffs' claims for reimbursement.

1. Admissions to Bellevue and St. Vincent's.

Since plaintiffs only filed this action on March 10, 1981, the applicable four-month statute of limitations obviously bars relief for the first two instances, while Bruce was a patient at Bellevue from October 27, 1976 to April, 1977 and at St. Vincent's from June 23, 1978 to August 1, 1978, when plaintiffs contend that defendants deprived Bruce of a free and appropriate education. Accordingly, the Court grants defendants' motion for summary judgment as to claims concerning these two periods.

2. Liability for the Institute's Charges.

As set forth above, the EHA mandates a yearly review and evaluation of a child's progress as well as a new recommendation by the COH. Plaintiff contends that the funding recommendations or determina-

tions made by the State of New York deprived Bruce of his statutory right to a free and appropriate education. Since the EHA permits parents to challenge those specific COH or state recommendations, plaintiffs' action is one based upon the series of annual decisions on Bruce's placement that took place on August 27, 1978, August 13, 1979, July 28, 1980, and on August 18, 1982.[21] No determination was made in 1981. The statute of limitations would begin running anew with each such decision. *See Adler by Adler v. Education Department of the State of New York, supra,* 760 F.2d at 460.

a. July 27, 1978 to March 10, 1981.

Plaintiff concededly made no formal attempt to challenge any of the COH recommendations or state funding determinations made prior to the filing of this suit. Those decisions thus became binding on plaintiffs and the statute of limitations began to run ten days after they were made. Plaintiff commenced this suit only on March 10, 1981, more than four months and ten days beyond the date of the last COH determination made before this suit was filed. Consequently, plaintiff may not maintain an action for damages based on decisions made more than four months prior to the institution of this suit. The Court accordingly grants defendants' motion for summary judgment as to claims for this period as well.

b. March 10, 1981 to June 30, 1983.

Plaintiffs tolled the applicable statute of limitations when they filed this action on

---

**20.** Plaintiffs have argued that this action is more properly analogized to one in the nature of mandamus to compel an official to perform a duty and, therefore, that the Court must measure the running of the statute of limitations from the time that plaintiffs demanded the Commissioner's performance and he refused. Leaving aside the express characterization by the court of appeals that an action under section 1415(e)(2) is one to review an agency determination and assuming *arguendo* that the panel intended to leave open the possibility of this alternative characterization, the argument avails plaintiffs nothing. Through informal channels, they demanded as early as March 10, 1977 that the State reimburse them for Bruce's stay at

Bellevue, as early as April 27 1979 that the State reimburse them for Bruce's stay at St. Vincent's Hospital and for the charges accruing at the Institute. Measured this way, those claims would be time-barred. Were plaintiffs to argue that they never made a formal demand upon the Commissioner until they filed this action, their claims would nonetheless likely be barred by laches. 8 J. Weinstein, H. Korn & A. Miller. *New York Civil Practice* § 7804.02 & n. 21 (1987).

**21.** Plaintiffs timely challenged the recommendations made in 1982.

March 10, 1981. Thus the claims concerning the charges made by the Institute from March 10 until Bruce no longer qualified to be educated under the EHA on June 30, 1983 are properly before the Court.[22]

C. The Respective Obligations of Parents and the State Under the EHA.

At all times relevant to this suit the EHA and the New York Education Law obliged defendants to provide Bruce a free and appropriate public education. From March 10, 1981 until Bruce became twenty-one and the EHA no longer applied to him, defendants paid the bulk of the Institute's charges pursuant to the preliminary injunction issued in this Court as upheld by the court of appeals.[23] Neither the status quo provisions of the Act nor the equitable considerations appropriate to granting a preliminary injunction, however, shift substantive statutory responsibilities mandated by the EHA. *Eugene B. Jr. by Eugene and Kathe B. v. Great Neck Union Free School District*, 635 F.Supp. 753, 759 (E.D. N.Y.1986); *Board of Education of the*

*City of New York v. Ambach, supra*, 612 F.Supp. at 234; *see School Committee of the Town of Burlington v. Dep't of Education of Massachusetts, supra*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385. Thus although defendants were required to pay the expenses of Bruce's stay at the Institute until they made an alternative placement, which they were never able to do, the Court must assess the ultimate liability for those expenses under the relevant provisions of the EHA tempered by the equitable considerations appropriate to consider in granting relief for violations of the EHA.

On this issue, the parties have labored to shade this controversy far more starkly black and white than sensible or responsible advocacy would require. Plaintiffs contend that once the COH recommended and they accepted Bruce's placement at the Institute, which is a psychiatric hospital, the state defendants became obliged to pay the entire expense of the placement. Defendants in turn contend that so long as Bruce's emotional and behavioral problems

---

**22.** Defendants seemingly concede as much in their papers when they direct their arguments on the statute of limitations only to claims made for periods prior to the commencement of the suit. *See* Defendant's Memorandum of Law in Support of the State and City Defendants' Renewed Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56 at 30–34 & n. 30. Although the logic of applying the four-month statute of limitations rigidly to defendants' actions would seemingly bar claims founded on the last determination to pay only tuition made in 1980 and hence bar potential recovery of the Institute's charges until defendants reached a subsequent decision, in this instance actually the COH's failure to make any determination in August of 1981, such an application would produce absurd results and frustrate the purposes of the EHA in that aggrieved parents would forced to wait for a subsequent annual COH determination to obtain relief. Furthermore, as New York recognizes, the duty to pay for services such as health care or education represents in reality a continuing obligation. *Chase v. Boisvert*, 78 Misc.2d 1061, 359 N.Y.S.2d 400 (Sup.Ct. N.Y.Cty.1974).

**23.** In seeking to overturn that injunction, defendants had argued that the status quo provision of the EHA required only that the State maintain the financial arrangements existing prior to the suit, that is, the State would continue to pay only the tuition component of Bruce's

placement at the Institute. The Second Circuit explicitly rejected that argument, principally on the ground that defendants had approved Bruce's placement at the Institute.

> We can agree with the State defendants that § 1415(e)(3) does not require a State to undertake payments for continuation of a child's placement that had been selected unilaterally by the parents. But Bruce's placement at the Institute was made by the COH, exercising its responsibilities under federal and state law. It selected an institution from a list approved by the State defendants. Once that placement was made, we think the purposes of § 1415(e)(3) are best fulfilled by obliging the State to pay for the placement, at least during the interim that apparently will be required to select an alternative placement.
> Even if § 1415(e)(3) does not provide explicit authority for the District Court's interim order, the order is fully sustainable on traditional preliminary injunction considerations.... If the local COH has failed to make an alternative placement in violation of its obligations to the State, that circumstance does not entitle the State to disclaim its statutory responsibilities to Bruce and his parents.

673 F.2d at 52–53. Since that time, defendants have paid the expenses of Bruce's placement except charges, such as those for pharmaceuticals, they contend are clearly for medical treatment specifically excluded by the EHA.

prevented him from attending the high school on the Institute's campus, he was, in effect, uneducable and hence that the state had no responsibility for any of the charges. To this end, defendants baldly maintain that they "satisfied any obligation they had to Bruce under the EHA by making arrangements to provide *educational services* at the Institute free of cost to the Vander Malles. Adequate funds were deposited with the Institute to cover tuition costs." Defendants Reply Brief at 8. The State of New York, however, may not so easily eschew its obligation to provide Bruce Vander Malle meaningful access to an appropriate education. The peculiar and tragic circumstances of this case combined with defendants' niggardly, unyielding, and quite simply erroneous view of their obligations under the EHA constrains the Court to review at some length the import of the substantive guarantees of the EHA.

A. A Free and Appropriate Public Education Under the EHA.

The Act itself defines a free and appropriate education in rather general terms.

The term "free appropriate public education" means special education and related services which (A) have been provided at public expense, under public supervision and direction, and with charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. 1401(18). "Special education," as referred to in this definition, means "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instructions in hospitals and institutions." *Id.* § 1401(16). "Related services" are defined as "transportation, and such developmental, corrective, and other supportive services ... as may be required to assist a handicapped child to benefit from special education." *Id.* § 1401(17); *see generally Board of Education of the Hendrick Hudson Central School District v. Rowley,* supra, 458 U.S. at 188–197, 102 S.Ct. at 3041–3046.

In its first consideration of the EHA in *Rowley,* the Supreme Court elaborated that the Act does not merely fund programs but obligates the states to provide meaningful access to education and mandates that they provide certain minimum levels of educational benefits. As the Court also observed, however, the EHA does not require the states to provide services to permit each child to maximize his or her potential.

Implicit in the congressional purpose of providing access to a "free appropriate public education" is the requirement that the education to which access is provided be sufficient to confer some education benefit upon the handicapped child. It would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education. The statutory definition of "free appropriate public education," in addition to requiring that States provide each child with "specially designed instruction," expressly requires the provision of "such ... supportive services ... as may be required to assist a handicapped child to *benefit* from special education." We therefore conclude that the "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide education benefit to the handicapped child.

*Id.* at 200–01, 102 S.Ct. at 3048 (citations omitted, emphasis in the original).

In reviewing a specific case brought under the EHA, a court must assess whether the education laws of the states violate the EHA and whether state officials met their obligations under state and federal law in formulating IEPs for specific children.

When the language of the Act and its legislative history are considered together, the requirements imposed by Congress become tolerably clear. Insofar as

a State is required to provide a handicapped child with a "free appropriate public education," we hold that it satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP. In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act, and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

*Id.* at 203–04, 102 S.Ct. at 3049.

█ Because Congress intended to provide education for all children "regardless of the severity of their handicaps," 20 U.S.C. § 1412(2)(C), education within the meaning of the Act must necessarily be broadly interpreted. The particular educational services which the states may be required to fund in any given instance reflect the interrelated goals Congress sought to promote by passing the Act.

The Education Act embodies a strong federal policy to provide an appropriate education for every handicapped child. Three interrelated purposes underlay its passage. First, Congress sought to secure by legislation the right to a publicly-supported equal education opportunity which it perceived to be mandated by *Brown v. Board of Education* [347 U.S.

483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)], and explicitly guaranteed with respect to the handicapped by two seminal federal cases.... Second, Congress intended the provision of education services to increase the productive capacities of handicapped citizens. Third, Congress acknowledged the need for an expanded federal fiscal role to aid state compliance with the court decisions and to assure protection for the rights of handicapped children.

*Kruelle v. New Castle County School District,* 642 F.2d 687, 690–91 (3rd Cir.1981) (citations omitted). In light of Congress' purposes to secure personal independence and to enhance productivity, when necessary an appropriate education must provide training in rudimentary social and personal skills. "Where basic self-help and social skills such as toilet training, dressing, feeding and communication are lacking, formal education begins at that point." *Battle v. Commonwealth of Pennsylvania,* 629 F.2d 269 (3d Cir.1980).

2. Residential Placement.

█ While in most situations a free appropriate public education can be provided in daytime classrooms or special education programs, the EHA does provide for residential placement when such placement may be necessary to meet the individual needs of a handicapped child. *See* 20 U.S.C. § 1401(16), 1413(a)(4)(B); 34 C.F.R. §§ 300.302, 551. If a residential placement is required, room, board, and related services must be provided at no cost to the child's parents.[24] *Parks v. Pavkovic,* 753 F.2d 1397, 1404–05 (7th Cir.1985); *Kruelle v. New Castle County School District, supra,* 642 F.2d at 692.

---

24. The New York Education Law presently acknowledges as much.

"Maintenance expense". For purposes of this article "maintenance expense" shall mean the dollar amount charged for room and board and allocable debt service as determined by the commissioner for the living unit of the residential facility by a residential school and such reasonable medical expenses actually and necessarily incurred by a handicapped child while actually in attendance at a residential school, provided that such medical expenses shall be for diagnostic, evaluative, educationally related, and emergency care services as defined by regulations of the commissioner. Such dollar amount, which shall not include expenses which are otherwise reimbursable to a residential facility by a federal, state or local agency, shall be approved by the commissioner of education and the director of the division of the budget and shall not be otherwise payable or reimbursable. N.Y.Educ.Law § 4401(3).

States may not escape responsibility for the costs properly associated with a residential placement simply by stating that the placement addresses physical, emotional, psychological, or behavioral difficulties rather than or in addition to educational problems. *Parks v. Pavkovic, supra,* 753 F.2d at 1406 (citing, *inter alia, Kruelle v. New Castle County School District, supra*); *Christopher T. v. San Francisco Unified School District,* 553 F.Supp. 1107, 1119–20 (N.D.Cal.1982).

*Parks* involved a class action by the parents of developmentally disabled youngsters who suffered from mental retardation, epilepsy, autism, or other conditions which would require services such as those required by mentally retarded persons. The State of Illinois required parents of such children to contribute up to $100 per month toward their maintenance at a residential facility. Plaintiffs contended that the contribution requirement violated the EHA. The State defended the action by asserting that the plaintiffs' developmental disabilities rather than their educational needs made the residential placement necessary. Writing for the panel, Judge Posner posited three individual to better illustrate the states' obligations for the costs of a residential placement under the EHA when both educational and medical needs warrant the placement.

In the first, a deaf and blind child, perfectly capable of living at home, is institutionalized on the basis of a judgment that he can get a better education in a more controlled environment. His living expenses in the institution would be expenses of his special education within the meaning of the Act and his parents would be entitled to reimbursement for them.

\* \* \*

In our second hypothetical case, the child is in a coma, and is institutionalized because he cannot be cared for at home. We understand the plaintiffs to be conceding ... that since the child would be completely uneducable in his condition— since he could not benefit from special education no matter how expensive—his living expenses in the institution would not be chargeable to the state under the Act.

\* \* \*

In the third case, an intermediate case ... the child cannot be cared for at home because of some purely physical problem, but, because of that problem, neither can he be educated unless he is institutionalized. Maybe he requires continuous medical attention which he could not get in a regular day school. So he must be institutionalized for education reasons but equally for medical reasons.... [T]he courts that have considered the question have rejected the argument that a state can avoid its obligations under the Act by showing that the child would have to be institutionalized quite apart from educational needs that also required institutionalization.

753 F.2d at 1406–07. As the remainder of the discussion in the case recognized and as numerous other cases have held, the problem requiring institutionalization in "intermediate" cases need not be simply physical. As long as the child is properly educable only through a residential placement, when the medical, social or emotional problems that require hospitalization create or are intertwined with the educational problem, the states remain responsible for the costs of the residential placement. *Kruelle v. New Castle County School District, supra,* 642 F.2d at 693; *see McKenzie v. Smith,* 771 F.2d 1527, 1534 (D.C.Cir.1985) (upholding residential placement for child who was both seriously emotionally disturbed and learning disabled); *Abrahamson v. Hershman,* 701 F.2d 223, 227 (1st Cir.1983) (district court appropriately ordered residential placement to provide necessary around-the-clock reinforcement); *Papacoda v. State of Connecticut,* 528 F.Supp. 68, 72 (D.Ct.1981) (federal law requires state funding when plaintiff's needs require a residential placement to integrate educational and therapeutic services); *Gladys J. v. Pearland Independent School District,* 520 F.Supp. 869 (S.D.Tex.1981) (schizophrenic child's social, medical and emotional difficulties sufficiently inter-

twined with her educational problems to require residential placement).

With this background, the Court can turn to a proper assessment of the respective financial responsibilities of the parties to this action for the charges incurred by Bruce Vander Malle at the Institute. To briefly summarize then, "[t]he Act was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives." *School Committee of the Town of Burlington v. Dep't of Education of Massachusetts, supra,* 471 U.S. at 372, 105 S.Ct. at 2004. Here the Court must inquire whether Bruce's IEP and the conditions of defendants' placement of Bruce at the Institute were reasonably calculated to enable him to receive free, appropriate educational benefits. In making this assessment, the Court must undertake an independent review of the evidence, but in so doing so must give due weight to the expertise of the school officials responsible for the child's education. *Board of Education of the Hendrick Hudson Central School District v. Rowley, supra,* 458 U.S. at 206, 102 S.Ct. at 3050. In deciding whether Bruce's residential placement was required by the EHA, and thus implicitly who is responsible to pay for the expenses incurred as a result of it, the Court must not decide the question on the basis of whether it would enhance an otherwise sufficient day program, but rather is to make the determination based upon an analysis of whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response solely to medical, social or emotional problems that are segregable from the learning process. Should it turn out that the placement was required, the Court is empowered to order reimbursement. *School Committee of the Town of Burlington v. Dep't of Education of Massachusetts, supra,* 471 U.S. at 370, 105 S.Ct. at 2003. Measured against this standard and by the EHA, case law interpreting the Act, and common sense, Bruce's placement at the Institute whereby the State of New York paid only the tuition component of the Institute's charges deprived him of a free and appropriate public education.

### 3. Bruce's IEP.

Bruce's residential placement was surely appropriate. That the COH had recommended and the state defendants had approved Bruce's placement at the Institute would preclude them from arguing otherwise. Even had the state defendants not approved the placement, the record clearly establishes that a residential placement for Bruce was not only warranted but required. Although Bruce possessed average intelligence and performed well when he did attend classes, the extreme emotional outbursts, antisocial behavior, and tendency to assault his fellow students, teachers, and parents precluded him from attending regular public or private day schools. This very behavior had occasioned his dismissal from Devereux. Dr. Chess and the psychiatric staff at Bellevue both noted that Bruce could not remain in a normal public school environment and recommended a highly structured residential setting as the only appropriate response to his needs.

Moreover, as is also apparent from the record, Bruce's educational disability could not be separated and treated apart from his emotional and behavioral problems. The residential placement responded to both. Bruce's schizophrenia required an extremely structured living environment, treatment with antipsychotic medication, and nearly continuous behavior reinforcement. In conventional schools, the stress and anxiety he experienced engendered the aggressive behavior which disrupted classes and, at times, endangered himself, his classmates, and his instructors. Had Bruce not been placed in an institutional setting, it is extremely doubtful that he could have been educated at all.

The program formulated by the psychiatric staff at the Institute to treat Bruce was education within the broad meaning of the term in the EHA. The program aimed to treat his illness by helping Bruce regain control over his emotional behavior, and by improving his interpersonal relationships to

the point that he would be able to relate to his family and, with hope, to return to formal schooling. To that end, Bruce's daily routine consisted of participating in housing unit activities and other group activities to foster socialization. It included as well attendance at DRS classes. Although this course of treatment ultimately proved less than completely successful, throughout the time he was placed at the Institute Bruce would have to be considered educable and he in fact participated in educational activities.

The foregoing discussion highlights the error in defendants' rigid insistence on equating a free and appropriate public education with conventional instruction in traditional classroom settings. The State of New York could not satisfy its obligation to Bruce simply by placing on deposit with the Institute funds to pay tuition at the high school on the hospital grounds. Previous attempts to educate Bruce in more traditional classroom situations had all failed. After a series of incidents, school officials from Charles Evans Hughes High School asked his parents to keep him home. When its staff could not control him, Devereux had to disenroll Bruce. The high school at the Institute, however, was no more suited to Bruce's needs than either of those two placements had been. As its principal explained, the high school on the Institute's grounds was a traditional school offering formal education for those patients at the Institute who could avail themselves of it. The high school did not offer related services, and normally performed no independent testing or evaluation of its students. In light of Bruce's history at the other traditional high schools he had attended, defendants could not satisfy their obligation under the EHA to educate him simply by making available in another setting precisely the form of instruction which had failed him before.

The terms of Bruce's independent educational placement therefore violated the strictures of the EHA. Accordingly, the Court grants plaintiffs summary judgment on the issue of liability for the period from March 10, 1981 through June 30, 1983.

4. Remedies.

■ Having held that defendants are liable, however, does not end the inquiry. The decision in *Burlington School Committee v. Department of Education, supra,* allowed only that reimbursement for violations of the EHA is possible, not that the Court must order reimbursement for all the expenses incurred in a private placement should the Court ultimately determine that the contested placement was inappropriate. *See Max M. v. Illinois State Board of Education,* 629 F.Supp. 1504, 1514 (N.D.Ill.1986). While the range of services the states are required to provide under the EHA as a related or supportive service is necessarily broad, it is not unlimited. The EHA specifically limits certain services provided by physicians.[25] This limitation reflected Congress' desire to limit costs by requiring a school district to provide a minimum level of health care services to permit the child meaningful access to an education and further to limit expenditures for those services by limiting their cost to that which would be charged by the minimum level of health care personnel recognized as legally and professionally competent to perform the required service. *Id.* 629 F.Supp. at 1513. In construing the exclusions from related services, the Supreme Court noted that Congress had intended to "spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence." *Irving Independent School District v. Tatro,* 468 U.S. 883, 892, 104 S.Ct. 3371, 3377, 82 L.Ed.2d 664 (1984); *see Detsel By Detsel v. Board of Education of Auburn,* 637

---

**25.** The included medical services fall within the rubric of the "related services" the Act requires the states to provide. They include:

 [t]ransportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and *medical* and counsel-

ing *services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist the handicapped child to benefit from special education,* and includ[e] the early identification and assessment of handicapping conditions in children.

20 U.S.C. § 1401(17); *see* 34 C.F.R. 300.13.

F.Supp. 1022, 1026–27 (N.D.N.Y.1986), *aff'd*, 820 F.2d 587 (2d Cir.1987).

As noted above, Bruce's placement at the Institute intended to address both educational and medical needs. The Institute's *per diem* rate includes a bed in a psychiatric ward, board, routine hospital services, floor duty nursing, professional services from the Institute's doctors, psychologists and staff, rehabilitation services and participation in DRS vocational programs. The Institute's billing thus does not segregate maintenance and related or supportive services from purely medical services not compensable under the Act. On the basis of the record, the Court cannot determine which portion of the charges incurred at the Institute should be assessed as maintenance and related or supportive educational services or whether any of Bruce's psychotherapy[26] provided by the Institute's psychiatrists should be compensated and if so at what rate. *See Max M v. Illinois State Board of Education, supra*, 629 F.Supp. at 1519 (psychotherapy provided by psychiatrist compensable and lower rate that would have been charged by a psychologist). The issue of which portion of the charges incurred in maintaining Bruce at the Institute between March 10, 1981 and June 30, 1983 is properly reimbursable, therefore, must be tried. Accordingly, the Court denies plaintiffs' motion for summary judgment on the issue of damages.

### CONCLUSION

The gravamen of plaintiffs' complaint concerns defendants' violation of substantive obligations under the EHA to pay for Bruce Vander Malle's residential placement at the Institute of Living. Because plaintiffs could seek redress for those violations under the EHA, that statute provides the exclusive means by which to pursue their rights. Accordingly the Court grants that portion of defendants' motion seeking to dismiss all of plaintiffs' claims except those premised on the EHA. The four-month statute of limitations applicable to the EHA

bars all of plaintiffs' claims for relief before March 10, 1981. The Court therefore grants defendants' motion for summary judgment as to those claims as well. For the period March 10, 1981 to June 30, 1983, defendants deprived Bruce Vander Malle of the free and appropriate public education to which he was entitled under the Act. Accordingly the Court grants plaintiffs' motion summary judgment in part on the issue of liability for that period. Because factual issues remain as to which expenses are properly reimbursable under the EHA, the Court denies plaintiffs' motion on the issue of damages. The parties are hereby directed to confer and to submit to the Court by October 2, 1987 proposed dates by which they intend to complete discovery and to submit a pretrial order.

It is so ordered.

---

**26.** Psychotherapy may be reimbursed as a related service. *Max M v. Illinois State Board of Education*, 629 F.Supp. 1504, 1519 (N.D.Ill. 1986); *T.G. v. Board of Education of Piscataway*, 576 F.Supp. 420, 423 (D.N.J.1983), *aff'd*,

738 F.2d 420 (3rd Cir.), *cert. denied*, 469 U.S. 1086, 105 S.Ct. 592, 83 L.Ed.2d 701 (1984); *Papacoda v. State of Connecticut*, 528 F.Supp. 68, 72 (D.Conn.1981).